**WILLIAM F. KLINGENSMITH, INC.**
**v.**
**The UNITED STATES.**
**No. 80–73.**

United States Court of Claims.
Nov. 20, 1974.

Michael A. Steuer, Washington, D. C., for plaintiff, Branko Stupar, Washington, D. C., attorney of record.

Michael J. Rubin, Washington, D. C., with whom was Asst. Atty. Gen. Carla A. Hills, for defendant.

Before LARAMORE, Senior Judge, SKELTON and BENNETT, Judges.

PER CURIAM:

This case comes before the court on plaintiff's request, filed May 16, 1974, for review by the court of the recommended decision filed on March 18, 1974, by Senior Trial Judge Saul Richard Gamer (then Chief of the trial division and since retired), pursuant to Rule 166(c), on plaintiff's motion and defendant's cross-motion for summary judgment, and on defendant's motion, filed June 17, 1974, to adopt the said recommended decision. The case has been submitted to the court on the briefs of the parties and oral argument of counsel. Upon consideration thereof, since the court agrees with the said recommended decision, as hereinafter set forth,* it hereby affirms and adopts the same as the basis for its judgment in this case. It is therefore concluded that

* The necessary facts are stated in the opinion.

plaintiff is not entitled to recover and plaintiff's motion for summary judgment is denied and defendant's like cross-motion is granted. Defendant's motion to adopt is granted and plaintiff's petition is dismissed.

## Opinion of Trial Judge

GAMER, Senior Trial Judge:

The dispute in this case grows out of the performance by plaintiff of a contract it entered into on March 6, 1969, with defendant, acting through the Public Buildings Service, General Services Administration, for the construction of Phase I of the United States Secret Service Training Center in Beltsville, Maryland. Included in the contract was site work, demolition, clearing, excavation, grading and the erection of masonry units. The site work requirements were spelled out in Division 2 of the Specifications. Included therein was a section—Section 0261—headed "Bituminous Pavement," under which plaintiff was to construct roadways and other paved areas. In connection with such construction, the section set forth the requirements for each of two base courses or layers which were to be constructed beneath the surface course. The dispute between the parties involves the material required to be used for one of these base courses. The material plaintiff was directed to use was more expensive than that which plaintiff proposed and contends it was entitled to use. Plaintiff claims the difference between such costs.

As the time approached for the performance of the paving work, plaintiff, in July 1969, sought approval from a Public Buildings Service employee of the material it felt it was authorized to use for such base course. The material was termed "bank run gravel," which, in the project area, is known as gravel in the form in which it comes out of a bank of natural gravel deposits. However, the employee concluded that, under the pertinent contract provisions, the layer in question was required to be a macadam

one. Thereupon plaintiff, by a letter of July 29, 1969 to the contracting officer, formally sought approval of the use of bank run gravel, relying on (a) the aforementioned Section 0261, (b) two details on a certain contract drawing (showing "Pavement Detail Sections" and "Typical Roadway & Shoulder Details"), which did not, with respect to the layer in question, indicate or even mention macadam, but did instead depict gravel, with one of the details specifically designating the course as a gravel one and (c) " * * * the applicable sections of the Maryland State Roads Commission Specification, 1962 edition." Section 0261 incorporated into the contract, "with modifications as specified herein," these Maryland specifications (entitled "State of Maryland, State Roads Commission, Specifications for Materials, Highways, Bridges and Incidental Structures").

By letter of August 13, 1969, the contracting officer advised plaintiff that under Section 0261 "the macadam base is clearly specified" and that the "bank run material is not acceptable for use as a macadam base." He relied on the provision of par. 4.3 of the Section which stated that "[m]acadam base layer shall be in accordance with Article 32.06" of the Maryland Roads Specifications (1962 edition). This article, headed "MACADAM BASE COURSE," set forth the requirements for such a layer. He acknowledged a conflict between the drawing upon which plaintiff relied and Section 0261, but pointed out that Article 2, entitled "Specifications and Drawings," of the contract's General Provisions, expressly provided that "[i]n case of difference between drawings and specifications, the specifications shall govern."

By letter of August 19, 1969, plaintiff requested the contracting officer to reconsider, and specifically asked for a final decision under the Disputes clause of the contract's General Provisions. By letter dated October 1, 1969, the contracting officer rendered his final deci-

sion, in which he reaffirmed his previous determination.[1]

Upon plaintiff's appeal to the General Services Board of Contract Appeals, in which plaintiff claimed $40,000 as costs incurred over those which would have been incurred had he been permitted to use bank run gravel, the Board, after holding a hearing, denied plaintiff's appeal by its decision of August 30, 1971. 71-2 BCA ¶9051. Plaintiff's motion for reconsideration was denied November 12, 1971 by a second Board opinion (GSBCA No. 3147). By its petition herein, filed under the Wunderlich Act (68 Stat. 81 (1954), 41 U.S.C. §§ 321, 322 (1970)), plaintiff attacks the Board's decisions and findings as being "erroneous as a matter of law" and as "arbitrary and not supported by substantial evidence."

Plaintiff places principal reliance upon the contention that there was an ambiguity as to what materials were required for the disputed layer which, in accordance with familiar principles, should be resolved against the drafter, i. e., the Government. While this question of interpretation raises a legal issue which the court itself is free to resolve, it is nevertheless plain that, in concluding that the contract "can in no way be interpreted as permitting the use of bank run gravel," the Board was correct.

■ There is no dispute that the paved areas were to have two base courses—one of which is the disputed layer in question—beneath the surface course of bituminous concrete. The above-mentioned "Bituminous Pavement" Section 0261 of the contract specifications so provided, par. 4, headed

"Base Course," setting forth, in 3 subparagraphs, the requirements for the two base courses, and par. 5, headed "Surface Course," setting forth the provisions for the bituminous concrete surface layer.[2] The three subparagraphs of Base Course paragraph 4, which directly relate to the problem at hand, are as follows:

4.1 Base course shall consist of 6 inches compacted thickness of stabilized soil base and 8 inches for Type HD, and 6 inches for Type LD compacted thickness of macadam base course.

4.2 Stabilized soil base layer shall consist of scarified sub-grade to a depth of 6-7 inches for a resultant 6 inches of compacted stabilized soil base course. Stabilized soil base course shall be in accordance with requirements of Article 32.02, including cross-referenced requirements, of State of Maryland referenced specifications.

4.3 Macadam base course layer shall consist of compacted 8 inches for Type HD and 6 inches for Type LD thickness placed over stabilized soil base layer. Macadam base layer shall be in accordance with Article 32.06, including cross-referenced requirements, of State of Maryland referenced specifications.

The course which plaintiff claims the right to construct as a bank run gravel one is the course described in subparagraphs 4.1 and 4.3 as the "macadam base course." As hereinabove set forth, plaintiff's claim that it has the right to disregard these explicit requirements of the specifications that the course be a

1. By letter of October 13, 1969, plaintiff, preserving its right to appeal the contracting officer's decision, requested that it be permitted to substitute a "Dense Grading Aggregate Base Course" (as described in Article 32.07 of the Maryland Roads Specifications) for the macadam base course which the contracting officer had ruled plaintiff was obliged to install. Plaintiff's request was granted and effected by a change order dated October 28, 1969. The order was without change in price. This permitted change has not been treated by the parties as affecting plaintiff's right to claim that it was entitled to use bank run gravel for the base course in question.

2. As described in par. 5, such surface course layer for heavy duty paved areas was required to consist of a 3″ base layer, and a 1″ surface layer, of bituminous concrete. For light duty areas, only one 2″ surface layer of such concrete was required.

macadam one is based principally upon the fact that the above-mentioned details on the contract drawing (No. 2–5, "Site Details") depicted the layer as a gravel one, with one of the details specifically referring to it as a "Compacted Gravel Sub-Base Course." [3] As shown, however, both the contracting officer and the Board concluded that, in view of the above-mentioned contract provision that the specifications governed over the plans, this conflict between the plans and the specifications was an insufficient basis for reading out of the specifications the provisions requiring that the course was to be a macadam one. The Board was clearly correct in holding that "the specification requiring a 'macadam' base layer was unambiguous," as was that part of Article 2 of the contract's General Provisions, hereinabove quoted, which "spelled out plainly that specifications govern over plans * * *." *Cf.* Merando v. United States, 475 F.2d 598, 600, 201 Ct.Cl. 19, 23 (1973). Under these circumstances, there was no such ambiguity as would call into play the rule that an ambiguity be resolved against the drafter, since such rule is subject to the condition that the alternative interpretation tendered by the other party be a reasonable one. Astro-Space Labs., Inc. v. United States, 470 F.2d 1003, 1010, 200 Ct.Cl. 282, 295 (1972). It is here plain that plaintiff's bank run gravel interpretation does not fall into such a category.

■■ Plaintiff further argues that, although Article 2 of the General Provisions of its contract does, as set forth above, provide that, where the drawings and specifications differ, "the specifications shall govern," nevertheless the incorporated Maryland Roads Specifications mandated the exact opposite, Section 10.05–4 thereof stating that "[i]n the case of any discrepancy between the Plans and the Specifications, the Plans are to govern." This conflict, says plaintiff, is an additional reason why the contract specifications should be considered to be ambiguous, and plaintiff's interpretation, therefore, adopted. The Board rejected this contention, holding that the language of Article 2 of the contract's General Provisions, "superseded contrary language in [Section 10.05–4 of] the incorporated Maryland Road Department Specifications." Here too the Board's conclusion is correct. The section of the Maryland Roads Specifications upon which plaintiff relies reads as follows:

*Section 10.05–4 Coordination of Plans, Specifications, Supplemental Specifications and Special Provisions.*

These Specifications, the Supplemental Specifications, the Plans, Special Provisions, and all supplementary documents are essential parts of the Contract, and a requirement occurring in one is as binding as though occurring in all. They are intended to be complementary and to describe and provide for a complete work. In the event of any discrepancy between the drawing and figures written thereon, the figures, unless obviously incorrect, are to govern over scaled dimensions. In the case of any discrepancy between the Plans and the Specifications, the Plans are to govern. If there is a discrepancy between these standard Specifications and Supplemental Specifications, the Supplemental Specifications are to govern. *Special provisions shall govern over Specifications, Supplemental Specifications, and Plans.* [Emphasis supplied.] [4]

---

3. It is conceded that if plaintiff is correct in its contention that the contract, properly interpreted, called for the course in question to be a gravel one, "bank run gravel" would be acceptable for the purpose.

4. This provision of the Maryland Roads Specifications is incorporated into the contract pursuant to par. 17.1 of the General Conditions of the contract which state:

"All documents and publications * * * which are cited in this contract for the purpose of establishing requirements * * * under this contract, shall be deemed to be incorporated herein as fully as if printed and bound with the specifications of this contract * * *."

Plaintiff's contract with defendant, which established their basic relationship and which, including the integral General Provisions, fixed the fundamental terms and conditions of such relationship, certainly constitutes the type of overriding "special provisions" contemplated by the last sentence of such section. In order to achieve its "ambiguity" plaintiff would read entirely out of its contract not only the two "macadam base course" paragraphs of Section 0261 of its contract specifications (paragraphs 4.1 and 4.3), but also Article 2 of its contract's General Provisions. To establish an "ambiguity," an interpretation which would require complete disregard of entire paragraphs in a contract will not normally be considered reasonable. Merando v. United States, 475 F. 2d 603, 605, 201 Ct.Cl. 28, 30 (1973). Furthermore, Article 2 of the contract's General Provisions is a part of mandatory Standard Form 23–A, whereas the Maryland Roads Specification provision relied on by plaintiff is, by incorporation, made a part of the project specifications. In such a situation, "the court will construe the agreement, to the extent it is fairly possible to do so, so as not to eliminate the standard article or deprive it of most of its ordinary coverage," and, therefore, "is justified in reading the specifications, if reasonably possible, to harmonize and not conflict with [the mandatory] standard clause." Morrison-Knudsen Co. v. United States,

397 F.2d 826, 829, 184 Ct.Cl. 661, 666 (1968). In any event, in view of the aforementioned last sentence of Section 10.05–4 of the incorporated Maryland Roads Specifications, there was no reasonable basis for any confusion as to Article 2 of the General Provisions being controlling.

In further support of its ambiguity contention, plaintiff relies on (1) certain errors in addition to the macadam-gravel conflict between the specifications and the drawing; (2) the fact that, by the time the Invitation for Bids was issued on January 10, 1969, a new edition of the Maryland Roads Specifications had been issued in March 1968, although in the contract specifications issued with the Invitation defendant was, without so stating, still referring to the sections of the previous 1962 edition;[5] (3) the fact that macadam had not been used in recent years in the Washington, D. C. area as a base course so that, plaintiff argues, it was therefore appropriately considered to be obsolete for such purpose, while bank run gravel had been so used; and (4) the Government's own estimator, in his prebid estimate, had calculated the paving cost on the basis of utilizing bank run gravel.

These factors are of little significance:

(1) The other errors which plaintiff claims added to its confusion were entirely unrelated to the macadam-gravel base course question.[6] Accordingly,

5. Article 17.1.2 of the contract's Section 0010, "General Conditions," provided that wherever reference was made to incorporated publications "the Contractor shall comply with the requirements set out in the edition specified in this contract, or if not specified, the latest edition or revision thereof * * * in effect on the date of the Invitation for Bids on this project * * *."

6. For instance, as the Board found, "the mix used for the binder layer had to be changed from that specified in Paragraph 5.2 [of Section 0261] because the specified material was incompatible with the material to be used for the surface layer." The Board acknowledged that "[s]pecification 0261 did contain errors," and concluded that "[i]t is

apparent that the Government was negligent in preparing Specification 0261."

In this connection it seems clear that, at least in one respect, the Board went too far. It cited as an "error" the fact that, in "Paragraph 2 [of Section 0261], entitled MATERIALS, Maryland specifications relating to Portland cement and water for concrete were cited; they had nothing to do with bituminous pavement." However, paragraph 5.2 of Section 0261 did refer to a layer of "bituminous concrete" for the surface course, to be "in accordance with Article 33.08 or Article 33.11" of the Maryland Roads Specifications. Such articles headed "BITUMINOUS ROAD MIX SURFACE COURSE" and "PENETRATION MACADAM" respectively, in turn referred, with

there was no reason why they should have caused plaintiff (or its paving subcontractor, who first raised the question involved in this case), any concern at all about that problem. As the Board correctly concluded: "Despite the deficiencies [in Section 0261], Paragraph 4 of Specification 0261 can in no way be interpreted as permitting the use of bank run gravel. There was no ambiguity as to what material was intended for the 8-inch base layer in that specification."

■ (2) The contract specifications were indeed faulty in not explicitly stating that the Maryland Roads Specifications being incorporated into the contract were those of the 1962 edition and not of the recently issued 1968 edition. However, it was obvious that it was the 1962 edition that was being referred to. As shown, it is paragraph 4.3 of Section 0261 that concerns the base course involved in the dispute, such Section stating that "[m]acadam base layer shall be in accordance with Article 32.06, including cross-referenced requirements, of State of Maryland referenced specifications." Article 32.06 of the 1962 edition of the Maryland Roads Specifications is, conformably, headed "MACADAM BASE COURSE." Article 32.06 of the 1968 edition of the Maryland Roads Specifications is, however, nonconformably headed "FOUNDATION LAYER," and makes no mention of a "macadam base course" or layer.

That plaintiff (or its subcontractor) was in no manner confused by the lack of specific reference to the 1962 edition is shown by its contemporaneous interpretation. Plaintiff's first letter with respect to this dispute—the aforementioned letter dated July 29, 1969 to the contracting officer—made reference to "specification section 0261 'Bituminous Pavement' and * * * also to the applicable sections of the Maryland State

Roads Commission Specifications, 1962 edition." The contracting officer's reply similarly referred to various articles which were in the 1962 edition, as did the parties' subsequent communications, none of which even mentioned the 1968 specifications or indicated any confusion with respect thereto. On this basis the Board correctly concluded that "[a]pparently both parties interpreted the contract as incorporating the 1962 edition of the Maryland specifications during the course of the contract work."

■ 3. The fact that macadam had not in recent years been used as a base course in the Washington, D. C. area is of no materiality.[7] The decision to revert to such use on this particular project was one for defendant to make and not plaintiff. As was stated in Jefferson Constr. Co. v. United States, 151 Ct.Cl. 75, 86 (1960):

* * * whether or not someone else would have effected the rehabilitation of the structure in a different, or even in a better, manner is essentially irrelevant. Any owner is entitled to have a construction project consummated in such manner as he may desire and to have the contract fulfilled in accordance with its terms. Farwell Company, Inc. v. United States, 137 Ct.Cl. 832.

■ 4. With respect to the interpretation problem with which the court is here faced, the prebid cost estimate made by the Government's estimator, which was based on gravel and not macadam, is of no consequence in view of the estimator's admission that in making his estimate, he relied only on the drawing (which contained the necessary dimensions). At the time he made his estimate, he was not familiar with the pertinent specifications and did not consider them.[8]

respect to the materials requirements, to Article 20.05, one of the Maryland Roads Specifications articles specifically referred to in the criticized Paragraph 2, and that Article did (in Section 20.05–2) in fact make numerous references to Portland cement and bituminous concrete.

7. The Board concluded that "an inference can be drawn that the specification requiring use of macadam was outdated."

8. The Board's reason for disregarding the estimate was that "[t]he fact that a Gov-

Plaintiff places heavy reliance upon a telephone conversation its representative had with a Government official (the Acting Chief of the Design Branch of the Public Buildings Service) just prior to the bid opening. The facts as found by the Board (or as are otherwise undisputed) with respect to this aspect of the case are as follows:

While preparing the bid for the contract, plaintiff's estimator received inquiries from proposed paving subcontractors concerning the conflict between the drawing and the specifications (as well as a conflict on the drawing itself [9]). The estimator decided to seek information from the defendant and, on the morning of the date on which the bids were to be opened,[10] called the office of the architect-engineers who had been employed by defendant and whose name appeared on the drawing in question. The architect-engineers' office advised, however, that the matter was no longer in their hands and suggested that the estimator attempt to obtain clarification by calling the office of the Chief of the Design Branch.[11] Upon so calling, however, the Chief (Acting) of such Branch informed the estimator that he could not respond to such inquiries on the telephone since such clarifications were required to be made through a formal addendum issued to all prospective bidders, an obviously impossible procedure to be put into effect at that time,

which was only 3 hours before the bid opening. Plaintiff's estimator then replied that his "only solution" was "to interpret to my advantage which is to use bank run gravel base course."[12]

Plaintiff relies on the general rule that if a party "enters into a contract with knowledge of the other party's interpretation of it, [it] is bound by such interpretation * * *" and is deemed to have "acquiesced in" such meaning. Perry & Wallis, Inc. v. United States, 427 F.2d 722, 725, 192 Ct.Cl. 310, 314–315 (1970). Clearly, however, this principle is inapplicable to the facts of this case. The Board correctly held that plaintiff could gain no advantage by this telephone conversation made so shortly before the bid opening. It pointed out that the title page of the Invitation for Bids, dated January 10, 1969, specifically stated:

8. Explanation to Bidders:

Requests for clarification or interpretations of bid documents (except amendments) must be submitted in "Sufficient Time" (which, for the purpose of this Invitation, shall mean not less than 10 calendar days prior to date for receipt of bids) and in accordance with requirements of Standard Form 22, Instructions to Bidders, and modifications thereto. Questions regarding amendments may be submitted at any time prior to the date for receipt of bids.

ernment estimator also mistakenly figured in the cost of gravel instead of the prescribed substance is not binding on the Government and does not make the plain meaning of Section 4.3 any less clear to the Board."

9. Detail 3 on the drawing, showing a pavement cross section, referred to the course in question as an "8-inch compacted gravel sub-base course" whereas Detail 4, showing a typical roadway cross section, referred to the course as an "8-inch compacted soil base" (although it depicted gravel).

10. The opening was to be held at 2 p. m. on January 30, 1969.

11. Defendant contends that the Chief of the Design and Construction Division was the official authorized to handle requests for clarification and not the Chief of the Design Branch. This contention has no validity. The Invitation for Bids stated:

"Requests for clarification or interpretation of bid documents prior to date of bid opening should be addressed to: Chief of Design and Construction Division, General Services Administration, Public Buildings Service, Region 3, 7th and D Streets, S.W., Room 2652, Washington, D.C. 20407, Attention: Chief of Design Branch."

12. The estimator further stated that if plaintiff was the low bidder and obtained the contract and if a dispute subsequently arose concerning the matter, he would call upon the Government official to testify to the conversation.

The referred to Standard Form 22, "Instructions to Bidders (Construction Contract)," which was included in the Invitation, provided:

1. *Explanations to Bidders.* Any explanation desired by a bidder regarding the meaning or interpretation of the invitation for bids, drawings, specifications, etc., must be requested in writing and with sufficient time allowed for a reply to reach bidders before the submission of their bids. Any interpretation made will be in the form of an amendment of the invitation for bids, drawings, specifications, etc., and will be furnished to all prospective bidders. Its receipt by the bidder must be acknowledged in the space provided on the Bid Form (Standard Form 21) or by letter or telegram received before the time set for opening of bids. Oral explanations or instructions given before the award of the contract will not be binding.

Under these explicit provisions there can be no faulting the Board's conclusions that "[t]he estimator's telephone call, three hours before bid opening, did not meet the applicable contract requirements," that plaintiff's " * * * bidding stage inquiry was untimely and wholly deficient * * *," and that:

The contract clarification and interpretation requirements, which the Appellant failed to follow, are designed to give the Government sufficient opportunity to consider such discrepancies, and, if necessary, modify requirements by publishing an addendum in sufficient time to be considered by all bidders. Thus, the integrity of the bidding process would be violated if, in this case, we required the Government to issue a change order permitting the Appellant to use the less expensive bank run gravel rather than the material required by the specification.

▇▇▇ Even in "ambiguity" situations, the rule that the ambiguity is to be resolved against the drafter would not be applied where there is a failure to comply with contract provisions obligating the contractor to seek clarifications if there are conflicts and discrepancies in the drawings and specifications. Chris Berg, Inc. v. United States, 455 F.2d 1037, 1044–1045, 197 Ct.Cl. 503, 514–515 (1972). Where a contractor fails to bring a conflict or discrepancy to defendant's attention in a timely manner, as required by the contract terms, he cannot thereafter "bridge the crevasse in his own favor." Beacon Constr. Co. v. United States, 314 F.2d 501, 504, 161 Ct.Cl. 1, 7 (1963).

. Plaintiff contends that it should not be disadvantaged by its failure to comply with the contractual provisions concerning requests for clarification because such failure was allegedly directly attributable to defendant's own failure to abide by the provisions of 41 U.S.C. § 253 (1970), which provides that:

§ 253. *Advertising requirements.*

Whenever advertising is required—

. (a) The advertisement for bids shall be made a sufficient time previous to the purchase or contract * * *.

Plaintiff says the bidding time allowed was insufficient, as is further indicated, it contends, by a provision of the *Bidding Time* section of the Federal Procurement Regulations, 41 C.F.R. § 1–2.-202–1, which provides:

(c) *Minimum bidding time.* As a general rule, bidding time shall be not less than * * * 30 calendar days when procuring other than standard commercial articles or services.

In this case, the invitation was issued January 10, 1969, and the bids were opened January 30, 1969. Thus only 20 days were allowed, not the 30 days specified by the Regulation "as a general rule."

▇▇▇ This particular issue is a new one presented for the first time to this court. It was not advanced to the Board

which, naturally, did not consider or rule upon it. Accordingly, plaintiff has in this respect failed to exhaust its administrative remedy and is, consequently, precluded from raising the issue here. Ace Constr. Co. v. United States, 401 F. 2d 816, 823, 185 Ct.Cl. 487, 500 (1968), and cases there cited. The Regulation relied on does not rigidly compel a bidding time of 30 days. Subsection (a) provides that the time limitations specified be "[c]onsistent with the needs of the Government for obtaining the supplies or services." Subsection (b) specifies various "[f]actors to be considered" in establishing the bidding time, such as "[t]he urgency of the Government's need for the items or services." And subsection (c), after setting forth the 30-day provision upon which plaintiff relies, goes on to provide that: "This rule need not be observed in special circumstances or where the urgency for the supplies or services does not permit such delay." Had the issue been timely raised administratively, the record before the Board concerning it could have been developed, by testimony or otherwise, and the question as to whether the agency was justified in allowing only 20 days could then have been explored and ruled upon by the Board. Similarly, plaintiff could have been called upon to demonstrate why the request for clarification or interpretation could not have reasonably been made, as the Invitation for Bids specifically required, at least 10 days before the bid opening time even though the bidding period was only 20 days. None of this was investigated at the hearing. Plaintiff cannot expect this court to resolve all these issues in its favor on the basis of presumptions that the agency violated the statute and the regulations by fixing a 20-day bidding time, and that plaintiff could not reasonably have made appropriate inquiry at least 10 days before the bid opening.

For all of the reasons hereinabove set forth, plaintiff is not entitled to recover and the petition is dismissed.

