**MONARCH PAINTING CORPORATION,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

No. 792–86C.

United States Claims Court.

Feb. 8, 1989.

David R. Trachtenberg, Seattle, Wash., for plaintiff.

David B. Stinson, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant. Thomas P. Cook, Dept. of Army, of counsel.

## OPINION

NETTESHEIM, Judge.

This case is before the court on defendant's renewed motion for partial summary judgment. Plaintiff has opposed, and argument has been held. After a motion based on the same grounds was denied from the bench by an order entered on January 27, 1988, defendant conducted additional discovery and brought its renewed motion on the basis of a supplemental record.

---

**FACTS**

The following facts are undisputed.[1] On June 18, 1984, the Contracting Division of the 172d Infantry Brigade, now the Directorate of Contracting, 6th Infantry Division of the United States Army (the "Army"), issued Invitation for Bids No. DAKF70–84–B–0047 (the "IFB"), entitled "Interior Painting and Floor Refinishing in Military Family Housing," located at Fort Richardson, Fort Wainwright, and Fort Greely, Alaska. The IFB provided a Price Schedule calling for prices for each of the three posts. The Price Schedule supplied estimated square footage quantities for bid items listed on the Price Schedule and requested fixed unit prices per square foot for the different types of painting and floor refinishing requirements listed. There was no estimate or price requested for the painting of trim, window trim, or doors. The IFB was for award of a "requirements" contract.

On September 27, 1984, pursuant to the IFB, Monarch Painting Corporation ("plaintiff") was awarded the contract. 48 C.F.R. ("FAR") § 252.236–7002 (1985), entitled "Contract drawings, maps, and specifications," was incorporated into the contract at clause 59. The pertinent part of this section provided:

(b) Omissions from the drawings or specifications or the misdescription of details of work which are manifestly necessary to carry out the intent of the drawings and specifications, or which are customarily performed, shall not relieve the Contractor from performing such omitted or misdescribed details of the work but they shall be performed as if fully and correctly set forth and described in the drawings and specifications.

(c) The Contractor shall check all drawings furnished to him immediately upon their receipt and shall promptly notify the Contracting Officer of any discrepancies....

Since the contract would be performed at three separate posts, the Technical Specifi-

---

1. Plaintiff made factual assertions, e.g., Plf's Genuine Issue No. 4, in opposing defendant's motion for partial summary judgment that are not supported by the record to the extent that any citations were provided. See RUSCC 56(d)(2).

cations included a separate Statement of Work for each location. Paragraph 4, entitled "Scope of Work," provided:

The Contractor shall furnish all labor, materials, and equipment necessary to paint the interior and refinish floors of various buildings ... [at each post] in accordance with the technical specifications and drawings. Contractor shall paint the interiors and refinish hardwood floors in the buildings as noted on the drawings.

Specification 150(1), appearing in all three Statements of Work, described the methodology used by the Army to measure the square footage of all types of family housing dwellings at each post: "Three apartments of each type were measured to form an accurate square footage table. Payment for painting and refinishing will be made according to these square footages." Three separate Building Schedules listed the total amount of square footage within each apartment unit for each post.

Specification 8.3 found in the Statement of Work for each post stated:

The table below depicts total square footages for wall and ceiling painting in apartment types:

APARTMENT SQUARE FOOT TOTALS

Fort Richardson

| Unit Type | Wall | Ceiling |
| --- | --- | --- |
| 1 | 6,568 | 2,810 |
| 2 | 4,305 | 1,627 |
| 3 | 4,278 | 1,382 |
| 4 | 3,762 | 1,251 |
| 5 | 5,569 | 2,279 |
| 6 | 5,590 | 2,099 |
| 7 | 4,805 | 1,398 |
| 8 | 4,463 | 1,143 |
| 9 | 3,855 | 1,148 |
| 10 | 3,370 | 1,043 |
| 11 | 3,592 | 972 |
| 12 | 3,853 | 1,027 |
| 13 | 3,481 | 944 |
| 14 | 3,069 | 979 |
| 15 | 1,661 | 625 |

Fort Wainwright

| Unit Type | Wall | Ceiling |
| --- | --- | --- |
| 1 | — | — |
| 2 | 7,087 | 1,988 |
| 3 | 4,739 | 1,500 |
| 4 | 3,990 | 988 |
| 5 | 4,539 | 1,288 |
| 6 | 3,716 | 1,226 |
| 7 | 3,114 | 1,010 |
| 8 | 3,535 | 959 |
| 9 | 4,075 | 1,130 |
| 10 | 3,369 | 832 |
| 11 | 3,518 | 952 |
| 12 | 1,825 | 646 |

Fort Greely

| Unit Type | Wall | Ceiling |
| --- | --- | --- |
| A | 3,731 | 1,354 |
| B | 4,624 | 1,359 |
| C | 4,184 | 1,222 |
| D | 3,984 | 1,226 |
| E | 3,667 | 1,136 |
| F | 3,409 | 1,034 |
| G | 3,857 | 1,064 |
| H | 2,995 | 969 |
| I | 3,170 | 945 |
| J Upstairs Apt. | 1,499 | 639 |
| J Downstairs Apt. | 1,479 | 617 |
| J Common Hall | 1,336 | 320 |

The drawings for each post contained a Building Schedules listing the type of apartments and rooms to be painted and the estimated square footage for walls and ceilings in each type of apartment unit. A separate table captioned "Window & Door Schedule and Dimensions" was provided on the Building Schedule for each post. Two of the Building Schedules did not include square footage estimates for doors, trim, or window trim. The Building Schedule for Fort Richardson noted that door measurements were excluded in the square footage and that trim around the windows was not computed in the total square footage. The Building Schedule for Fort Greely noted that doors were included, but not windows. The Building Schedule for Fort Wainwright contained no notes pertaining to trim, windows, or doors.

The painting of doors, trim, and window trim is substantially more expensive and labor intensive than the painting of flat surfaces comprising walls or ceilings. In order to calculate accurately the adjustment in total square footage, so as to fully compensate the contractor for the more difficult task of painting the trim, window trim, and doors, plaintiff's bid item unit price, including painting of flat surfaces, must be adjusted by a "difficulty factor." The contract documents did not direct the

calculation or inclusion of a "difficulty factor" to make an adjustment. Instead, the drafters of the Army's specifications expected that a bidder would include an additional amount in its bid for windows and doors and for trim based on the amount of trim the bidder calculated from the window and door dimensions listed on the Building Schedules.

In sum, the Price Schedule, the tables of Apartment Square Foot Totals contained in the specifications for each post, and the Building Schedules in the contract drawings did not contain separate square footages for all the trim work. However, note 5 of the Price Schedule provided:

> Item A for 0001 and Item B for 0002 and 0003 includes all walls & ceilings not previously textured and the painting of all cabinets, door and window trim, doors, shelving, piping and ventilating louvers excluding natural wood surfaces.

Item A for 0001 and Item B for 0002 and 0003 required the contractor to "[t]exture, prime, & apply one coat of enamel." Note 6 of the Price Schedule provided:

> Item B for Item 0001 and Item C for 0002 and 0003 includes all wall & ceilings previously textured, all cabinets, door and window trim, doors, shelving, piping and ventilating louvers excluding natural wood surfaces.

Item B for 0001 and Item C for 0002 and 0003 required the contract to "[s]pot texture & apply one coat of enamel."

Part of the Statement of Work was reiterated on the drawings for each post. Section b of ¶ 5, entitled "Special Conditions," stated that "[s]pecial attention shall be given to proper preparation of window frames and trim, in accordance with Division 9, Paragraph 6.2." Division 9, § 920, of the Technical Specifications, entitled "Interior Painting," ¶ 6.2. provided:

> All existing excessive, loose or peeling paint on ceilings, walls, shelves, closets, windows, metal surfaces, etc., shall be removed by scraping and then sanding smooth. All wood surfaces shall be primed before painting.

Division 9, § 920, ¶ 3.1.5 provided:

> Doors shall include all closet and cabinet doors and other interior and exterior doors. In quarters where the occupant has removed doors and stored them in the basement, the Contractor shall paint such doors and leave them in the basement. All doors shall be painted on all surfaces. See paragraph 6.4.5. Where an existing varnished interior door exists, the door will be varnished. All existing interior enameled doors will be repainted with enamel.

Paragraph 6.4.5 required that "[a]ll previously painted wood doors and trim surfaces shall be roughened by sanding so final finish will adhere."

Paragraph 6.3.7 provided, in pertinent part:

> Defects on the doors, such as dents, holes, scratches, checking and open grain will be spackled and the door sanded smooth. Enamel painted doors shall have the top layer of enamel prepared by sanding, removing sanding dust, and applying one coat of primer TT–E–545a and one finish coat of TT–E–508c....

Paragraph 6.4.1 provided the following guidance for the preparation of doors, trim, and other wood surfaces: "[a]ll wood surfaces or trim, i.e., casing, stops, base shoe, baseboard, etc., that is loose, separated, bulging or warped, shall be renailed, and pulled as close as possible to adjoining surface or surfaces."

Paragraph 7.5, at ¶ 7.5.1 entitled "Method of Paint Application," stated, in applicable part:

> Semi-gloss enamel for trim, door frames, window frames, doors, shelving, miscellaneous wood—by approved brush, roller, or spray ... All wall, ceiling and floor surfaces shall be protected from trim overspray.

Paragraph 8 set forth the surfaces that the contractor was required to paint. Paragraph 8.1. provided: "General: The surfaces listed in the painting schedule below shall receive the surface preparation, paints and number of coats prescribed. Explanatory information for use with the paint schedule is as follows[.]"

Paragraph 8.2, entitled "Painting Schedule," provided, in pertinent part:

| Surface | Surface Preparation and Pretreatment | Finish Coat |
|---|---|---|
| Wood & metal interior trim, windows, and both interior and exterior doors. | Scrape, sand & clean. Spot prime w/TT-E-545a. | TT-E-508C |

By letter dated November 21, 1984, plaintiff informed the Army that it had

> encountered a disagreement in the measurement of work in each unit of the above captioned contract. The plans and schedules clearly omit the doors, windows, and varnished areas from the listed square footages.
> We refer to Plan #2 of the Fort Richardson plans and specifically the following notes:
> > "Note #3 Trim around windows are not computed in total square footage in the above table."
> > "Note #5 Varnished areas are not included in total square footages."
> > "Note #6 Door measurements are not included in total square footages."
> Section 150 paragraph 1.1 stipulates specifically that the wall surfaces do not include windows.
> Section 920 paragraph 3.1.3 states that walls are specifically defined as areas perpendicular to the floor excluding doors, windows, cabinets and louvers.
> Please note the following information from Plan #2 of the Fort Wainwright plans, specifically the 'Building Square Footage Schedule'.
> > This building schedule does not list any footages for trim, cabinets, shelves, doors or windows.
> > Note #4, however, stipulates that cabinets and shelving are included in the listed square footage. There is no mention of windows, doors or varnished areas, so obviously they are not included.
> There is certainly no question that the intent of the above quoted notes is to delete the windows, doors and varnished areas from the square footage listed for each unit.

> Please note Plan #2 of Fort Greely. Note D excludes windows but does not exclude doors from the total square footage.
> From the above stipulations, all windows, doors and varnished areas are not included in the listed square footages at Fort Richardson and Fort Wainwright and that only the doors are included at Fort Greely in the listed square footage.
> Please refer to Note #5 of the price schedule wherein it stipulates payment to be made on all walls and ceilings, all cabinets, doors and windows, shelving, piping and ventilating louvers at the price indicated on item A of bid schedule 0001 and item B of bid schedules 0002 and 0003. Consequently, any of these surfaces that are painted we are to receive payment for. It is obvious that the windows, doors and varnished areas have been removed from the listed square footages and there is no provision anywhere to include them again in the listed work or in our price per square foot of wall surface. There is a provision listed for payment but no requirement to paint these surfaces.

Plaintiff submitted a certified claim on May 22, 1985, claiming that the Army's "direction" to the contractor to paint trim was a change in the contract entitling plaintiff to an equitable adjustment of the contract price. However, plaintiff's letter did not specifically request a final decision from the contracting officer.

Plaintiff's May 22, 1985 letter also requested compensation for alleged additional costs incurred as a result of the Army's issuing contract modifications. The original specifications for floor refinishing, ¶ 4.1.1, entitled "WOOD FLOOR REFINISHING," required that the contractor "[r]emove all existing quarter round base

shoe molding and replace [it] with new to match existing base molding," which was coated with enamel paint. In November 1984 the Army issued proposed Modification No. P000001, which changed that specification to require that the contractor "[r]emove all existing quarter round base shoe molding and replace [it] with new to match existing flooring," which was varnished in natural wood. Paragraph 4.2.2, which was unaffected by Modification No. P000001, provided in pertinent part as to "[f]inishing": "Install new ¾" × ¾" quarter round base shoe molding which has been primed with one coat of TT–E–545a and painted with one finish coat of TT–E–508C."

By letter dated November 26, 1984, plaintiff provided the Army with an estimate for an alleged cost increase due to Modification No. P000001. In response Army engineers conducted their own review and determined that the contractor's cost of performing the work would decrease as a result of the modification.

The contracting officer issued a final decision on December 30, 1985. By letter dated January 8, 1986, plaintiff notified the Army that the final decision failed to address the entirety of plaintiff's claims. Thus, on January 14, 1986, the contracting officer expanded the final decision to include the painting of baseboards, doorjambs, and base molding along the stairwell. Both the original and supplemental final decision dealt exclusively with plaintiff's request for compensation for the trim work. The January 14, 1986 letter expressly stated that "[t]he base shoe molding is a separate issue which is still under review." Plaintiff's complaint was filed on December 19, 1986.

## DISCUSSION

Summary disposition requires that no genuine dispute exist as to any material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor...." *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2514 (citation omitted). As the opponent of summary judgment, plaintiff shall "receive the benefit of all applicable presumptions, inferences, and intendments." *Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985). The court should "resolve all doubt over factual issues in favor of the party opposing summary judgment." *Litton Indus. Prod., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir. 1985).

The movant has the burden of establishing that there is no material fact in dispute and that it is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Molinaro v. Fannon/Courier Corp.,* 745 F.2d 651, 653–54 (Fed.Cir.1984). The movant may discharge the burden by showing an absence of evidence to support the non-movant's case, if the non-movant would bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

A summary judgment motion must be denied if a genuine issue of material fact exists. *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608. Nonetheless, the party opposing the motion has the burden of showing sufficient evidence, not necessarily admissible at trial, that there is a genuine issue of material fact in dispute. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553. "Mere denials or conclusory statements are insufficient." *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,* 731 F.2d 831, 836 (Fed.Cir.1984). The determination of which facts are material rests on the substantive law to be applied in each case. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

Two factors to be considered in deciding if a case is a proper one for summary judgment are whether the material facts necessary for decision have been adequately developed, as required by RUSCC 56(c), and whether future litigation would put the parties to unnecessary expense and would

also waste judicial resources. The Supreme Court emphasized the importance of Fed.R.Civ.P. 56 for purposes of judicial economy in *Celotex Corp:* "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. at 2555 (quoting Fed.R.Civ.P. 1, which is identical to RUSCC 1(a)(2)); *see also Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 1571 (Fed.Cir.1984); *Frangella Mushroom Farms, Inc. v. United States*, 229 Ct.Cl. 578, 583 (1981).

### 1. *Painting of trim, window trim, and doors*

Defendant contends that the contract was not ambiguous, but that insofar as the amount of painting for square footage of trim, window trim, and doors was not set forth in both the contract specifications and drawings (Building Schedules), a patent ambiguity was created. Defendant alternatively argues that if the contract documents created a latent ambiguity, plaintiff's interpretation was unreasonable. Plaintiff disagrees that the specifications, which set forth the method of work to be performed, included a statement of work or otherwise specified the scope of work to be performed under the contract. Although plaintiff agrees that the contract required the contractor to paint trim, plaintiff contends that the requirement was ambiguous as to the amount of required painting and the method of payment. Plaintiff disputes that the ambiguity was patent and argues that genuine issues of material fact preclude a finding that plaintiff's interpretation of the contract was unreasonable as a matter of law.

The court's first responsibility is to ascertain analytically whether *vel non* an ambiguity exists. *John C. Grimberg Co. v. United States*, 7 Cl.Ct. 452, 456, *aff'd*, 785 F.2d 325 (Fed.Cir.1985). Interpretation of the contract, including the specifications and drawings, is a matter to be resolved by the court. *P.J. Maffei Bldg. Wrecking*

*Corp. v. United States*, 732 F.2d 913, 916 (Fed.Cir.1984). An interpretation that gives a reasonable meaning to all parts of a contract will be preferred to one that leaves portions of the contract meaningless. *Fortec Constructors v. United States*, 760 F.2d 1288, 1292 (Fed.Cir.1985) (citing *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed.Cir.1983)). A contract is ambiguous if it is susceptible of two different interpretations, each of which is found to be consistent with the contract's language. *Sun Shipbuilding & Dry Dock Co. v. United States*, 183 Ct.Cl. 358, 372, 393 F.2d 807, 815–16 (1968).

The requirements contract specified the painting of trim, window trim, and doors (occasionally referred to in this opinion as "trim work"), and the Price Schedule asked the contractor to provide a unit price for all the items listed for each post, including the trim work. The Price Schedule provided estimated square footage of walls and ceilings only; the Building Schedules in the drawings did not provide estimates for trim work. The Army's interpretation that the Price Schedule called for trim work is consistent with the contractual language, as is plaintiff's only insofar as the Price Schedule did not indicate how the amount for trim was to be figured into the bidder's price per square foot. To this extent the contract was ambiguous. However, as will be discussed, no latent ambiguity was present because plaintiff's interpretation cannot be reconciled with other major contract provisions and is deemed unreasonable.

Assuming, *arguendo*, the existence of an ambiguity, the issue becomes whether the provisions at issue were patently ambiguous at the time of contracting. If they were, then a duty arises on the nondrafting party to inquire as to their meaning. *Fort Vancouver Plywood Co. v. United States*, 860 F.2d 409, 413–14 (Fed.Cir.1988) (citing *United States v. Turner Constr. Co.*, 819 F.2d 283 (Fed.Cir.1987)). Thus, if the plain meaning of contract terms gives rise to differing constructions, the court must inquire whether such a discrepancy would be apparent to a reason-

ably prudent contractor. *John C. Grimberg Co.*, 7 Cl.Ct. at 456. Contractors need only act reasonably—inquiring only as to major discrepancies, obvious omissions, or drastic conflicts in contract provisions. *WPC Enter. v. United States*, 163 Ct.Cl. 1, 6, 323 F.2d 874, 877 (1963).

Although it is not the actual knowledge of the contractor, but the obviousness of the discrepancy, that imposes the duty of inquiry, *Chris Berg, Inc. v. United States*, 197 Ct.Cl. 503, 515, 455 F.2d 1037, 1045 (1972), significant policy considerations underpin this rule when the contractor, as in this case, is aware of the discrepancy before it computes its bid. Requiring contractors to bring to the Government's attention "major discrepancies or errors," *Blount Brothers Construction Co. v. United States*, 171 Ct.Cl. 478, 496, 346 F.2d 962, 973 (1965), allows clarification of ambiguities or correction of errors before contract award and thereby avoids the need for expensive and complex litigation during contract administration. *See Beacon Constr. Co., v. United States*, 161 Ct.Cl. 1, 6–7, 314 F.2d 501, 504 (1963). The pre-award clarification requirement bolsters the competitive bidding system. The duty to inquire prevents one contractor from exploiting ambiguities in the contract so as to bid on only a portion of the work solicited and thereby appear to be the low bidder. Requiring disclosure of ambiguous provisions or constructions of the contract before bidding ensures that all contractors bid on the basis of identical specifications. *Id.*

The standard for determining a patent ambiguity is calibrated, but not precisely. To be denominated patent an ambiguity must be " '*so glaring as to raise a duty to inquire.*' " *Fort Vancouver Plywood Co.*, 860 F.2d at 414 (quoting *Turner Constr. Co.*, 819 F.2d at 296) (emphasis in original). The Federal Circuit in *Fort Vancouver Plywood Co.* instructed: "When determining whether contract language is patently ambiguous, the language must be placed at a point along a spectrum of ambiguity...." 860 F.2d at 414 (citing *Newsom v. United States*, 230 Ct.Cl. 301, 304, 676 F.2d 647, 650 (1982)). *Fort Vancouver*

*Plywood Co.* continued: "There is a grey area between the point along this spectrum at which a document requires more exacting language and that at which additional detail will add nothing but worthless surplusage...." 860 F.2d at 414.

■ In this case the point along the spectrum at which the ambiguity should be placed requires more exacting language. The contract required painting of trim, window trim, and doors; the Price Schedule—itself expressly calling for trim work—established the maximum quantities that could be ordered, but did not include estimates for trim, window trim, and doors.

The Army's specifications and drawings did not provide a clear instruction or method to estimate trim work. Indeed, as plaintiff argues, the Army had previously changed the contract documents to correct for problems perceived in the prior year's contract; and after further experience on the subject contract, the Army made additional changes to quantify trim work. The imperfections in the Army's documents, however, did not affect the scope of work relating to the painting of trim, window trim, and doors. *See Chris Berg, Inc. v. United States*, 197 Ct.Cl. at 511–12, 455 F.2d at 1042–43 (rejecting argument that drawings in painting contract were only portion that indicated where to paint, in contrast to the specifications which disclosed how to paint).

Brent Bodily, plaintiff's Project Manager who prepared plaintiff's bid, testified in deposition that he understood the contract to call for the painting of trim and further: "[T]he thing they were asking from us was just to bid on the wall surface." Thus, Mr. Bodily interpreted the contract as requiring the painting of trim, but, because the contract did not specify a method of payment for the trim work, he assumed that the Army would reimburse plaintiff for the actual square footage of trim that plaintiff painted in each unit. Plaintiff, by its bidder, Mr. Bodily, recognized the discrepancy, *i.e.*, that no price was requested for trim, window trim, and doors, but failed to inquire. Under these circumstances the

reasonableness of plaintiff's interpretation is irrelevant. *J.B. Steel, Inc. v. United States*, 810 F.2d 1139, 1141 (Fed.Cir.1987). The contractor must bear the consequences.

Plaintiff argues persuasively that the ambiguity cannot be deemed patent without relying on Mr. Bodily's interpretation. Therefore, the court has examined plaintiff's argument under the standard for resolving a latent ambiguity as an alternative basis for ruling on defendant's motion.

■ The court draws on its earlier decision in *John C. Grimberg Co.*, 7 Cl.Ct. at 456, for the formulation of this standard:

> The familiar rule that a non-patent ambiguity be resolved against the drafter "is subject to the condition that the alternative interpretation tendered by the other party be a reasonable one." *William F. Klingensmith, Inc. v. United States*, 205 Ct.Cl. 651, 657, 505 F.2d 1257, 1261 (1974) (per curiam); *Perry & Wallis, Inc. v. United States*, 192 Ct.Cl. 310, 316, 427 F.2d 722, 726 (1970). The issue is a question of law for the court to decide. *See, e.g., William F. Klingensmith, Inc.*, 205 Ct.Cl. at 656, 505 F.2d at 1260. The alternative interpretation need only be within the "zone of reasonableness," the Government shouldering "the major task of seeing that ... the words of the agreement communicate the proper notions...." *WPC Enterprises, Inc. v. United States*, 163 Ct.Cl. at 6, 323 F.2d at 876–77 (quoted in *Folk Construction Co. v. United States*, 2 Cl.Ct. 681, 688 (1983)). The Government "must bear the risk of an insufficient attempt, even though the plaintiff's obtuseness likewise contributed to the ... misunderstanding." 163 Ct.Cl. at 11, 323 F.2d at 879. In judging the import of the words of the contract, "the context and intention [of the contracting parties] are more meaningful than the dictionary definition," *Rice v. United States*, 192 Ct.Cl. 903, 908, 428 F.2d 1311, 1314 (1970), and the contract language "must be afforded the meaning derived from the contract by a reasonably intelligent person acquainted with the contemporary circumstances." *Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971). The court frequently must place itself in the shoes of a reasonable contractor in considering the contract language. *Id.*

The contractor's interpretation of a non-patent ambiguity cannot render a major portion of the contract inconsistent or meaningless. *See Brutoco Eng'g & Constr., Inc. v. United States*, 12 Cl.Ct. 104, 109, *aff'd*, 833 F.2d 1023 (Fed.Cir. 1987).

■ Mr. Bodily testified in his deposition as to his thought process in computing plaintiff's bid. Although he was aware that the contractor was to paint trim, he regarded trim as a "minor item" and considered that the Army would make trim "a special item" when it wanted trim to be painted. "If it had been a major item," he testified, "they would have an item listed here [on the Building Schedules] for trim and also on the bidding [Price] schedule." It was Mr. Bodily's view that it would not be unusual for the Army to hire plaintiff to paint whole units, for the most part, but not trim. Mr. Bodily also reasoned that to the extent that the Army had listed trim in the specifications, "I assumed that what they would do would be to factor the difficulty in the trim and pay it as equal to a square foot of wall surface when they listed that item of 22 cents [the amount plaintiff bid per square foot for Fort Richardson]. It was apparent to me that they intended to do so." He also explained the same idea thusly:

> In the bidding schedule, they called for just wall surfaces. Now, if those wall surfaces did not include the trim, then you are okay. But if they included the trim, then they would have had to make an adjustment for a factor on those trim surfaces to make them equal to a square foot of wall surface, and the thing they were asking from us was just to bid on the wall surface.[2]

---

**2.** Although the Building Schedules did not provide square footages for windows and doors

(except for Fort Greely), when the billing dispute arose, Mr. Bodily computed the square

This interpretation is unreasonable in several respects.

First, plaintiff's argument that the withholding of trim measurements signaled bidders to regard trim as extra work would render meaningless the Price Schedule's listing of trim as an item of work to be bid on, as well as the Statement of Work and the directions to paint trim, window trim, and doors in the Technical Specifications. Second, it is clear from the contract writings that the Army's purpose was to repaint and refurbish military housing units as those units became vacant. The specifications charge the plaintiff with a variety of tasks. For example, plaintiff was to repair and spackle all the defects it could find in the apartments. Thus, the contract as a whole contemplated that the Army intended the contractor to do more than paint the surfaces listed in the Building Schedules. Given the Price Schedule's explicit listing of trim work as an item of work and manifold references in the specifications to trim work, Mr. Bodily's interpretation that a bidder was not required to include trim work in its bid is not reasonable.

■ Plaintiff takes the position that inconsistencies, or lack of clarity, or possible confusion in Mr. Bodily's deposition testimony present genuine issues of material fact. A party cannot defeat summary judgment by instigating controversy with its own position on the facts, *Sohm v. United States*, 3 Cl.Ct. 74, 77–78 (1983), and the testimony upon which defendant relies is consistent. Plaintiff is not entitled to an inference that Mr. Bodily's testimony is less explicit than it is.

## 2. *Replacement of quarter round base shoe molding*

Plaintiff argues that the effect of Modification No. P000001, which required plaintiff to varnish instead of paint base shoe

moldings[3] increased its costs. Originally, the contract provided that the molding was to be painted the same color as the walls and ceilings. Plaintiff seeks compensation for the added work and expense of complying with the change. According to Mr. Bodily, the intent of Modification No. P000001 was

> to require that the base shoe molding be replaced with, not painted molding, but molding to match the floor finish. Upon receipt of the Contract Modification, I priced out the work to determine whether or not this would cost additional money over what had originally been required under the contract for purposes of making a determination as to whether or not we should seek additional compensation. It was my determination that this change would require work beyond the scope of the original contract requirements and that we would be entitled to additional compensation and priced it accordingly.....

In my opinion, the Government had not considered how the work was to be performed. If we were required to meet the original specifications which were to paint the base shoe molding, we would not have been required to mask this portion when we painted the walls but would be entitled, when we masked the floor for purposes of painting the walls, to have painted the base shoe molding at that time. Thereafter, when we covered the ... [floor] to paint the ... [walls], we were not required to come back, as we were under the revised specifications, and finish the new base shoe molding. This was the additional work, i.e., we had to come back a second time and go around each room to do the molding. We would not be entitled, nor would the work product be satisfactory, if we had pre-finished the base shoe molding and nailed it in place. We would still, at that time, have then had to come back and

---

footages for windows and doors based on the dimensions given in the Window & Door Schedule Dimensions for each fort and for the trim based on a guide well known to the industry. His actions support defendant's argument that the contract documents informed a reasonable

contractor that this method should have been employed in the first instance.

**3.** Base shoe moldings are strips of finished and contoured wood that are placed along the base of a wall where it joins the floor.

putty the nail holes, sand and place final coat of finish. Therefore, it was our opinion that we were being required to perform more work under the Contract Modification [than] under the original specifications.

Declaration of Brent Bodily, Nov. 28, 1987, at 5–7. His subsequent deposition testimony was consistent with the foregoing.

 It was plaintiff's plan to first detach the existing shoe molding, replace it with new molding, and then paint the new molding as plaintiff painted the walls. Mr. Bodily testified that the modification required plaintiff to come back and varnish the quarter rounds "with an entirely different material and a separate operation." Although it is true that the contract change meant the plaintiff would not be able to paint the molding and the walls at the same time or in one operation, this does not entitle plaintiff to an equitable adjustment to the contract price.

Plaintiff was never entitled to paint walls and moldings in the same operation. The contract specifications in ¶ 4.2.2, before and after modification, required the contractor to finish the quarter round prior to installing it in the units. Plaintiff's framing of its claim as requiring extra work on the theory that plaintiff could have achieved the economy it contemplated by painting the base and shoe molding at one time runs athwart the "ordinary and commonly accepted meaning," *Hol–Gar Manufacturing Corp. v. United States*, 169 Ct.Cl. 384, 390, 351 F.2d 972, 976 (1965), of the language employed in ¶ 4.2.2.

As the Army had a contractual right to performance in accordance with the unambiguous specifications that were capable of being performed, *Bromley Contracting Co. v. United States*, 14 Cl.Ct. 69, 77 (1987), *aff'd*, 861 F.2d 729 (Fed.Cir.1988) (citing cases), plaintiff cannot be heard to complain that it has been denied a method of performance that never would have been allowed under the contract.

**4.** Plaintiff's arguments not specifically addressed herein have been considered carefully

During argument it was pointed out that the specifications required that the molding be coated before attachment. Plaintiff's counsel then argued that "various things," "this and that" resulted in higher performance costs. Unfortunately, argument of counsel cannot substitute for factual statements under oath that establish a genuine issue of material fact. *Levi Strauss & Co. v. Genesco, Inc.*, 742 F.2d 1401, 1404 (Fed. Cir.1984).

### CONCLUSION

Based on the foregoing, defendant's motion for partial summary judgment is granted as to the claims in plaintiff's amended complaint for trim as an extra and for additional costs incurred in performing Modification No. P000001.[4] A separate order scheduling trial has been entered this date.

IT IS SO ORDERED.

and are deemed without merit.