**JOHN C. GRIMBERG COMPANY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 106–84C.**

United States Claims Court.

Feb. 26, 1985.

Richard J. Raeon, Washington, D.C., for plaintiff. Judith F. Herman, Braude, Margulies, Sacks & Rephan, Chartered, Washington, D.C., of counsel.

E. Kathleen Shahan, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant.

## OPINION

NETTESHEIM, Judge.

This matter is before the court on cross-motions for summary judgment.

### FACTS

An agreement modifying a contract entered into by plaintiff, John C. Grimberg Company, Inc. ("plaintiff"), and the General Services Administration ("GSA") gives rise to this case. The original contract was for the design, manufacture, delivery, erection, start-up, and testing of modular type fabric filter dust collectors, known as "baghouses," and other associated equipment, designed to remove flyash from the flue gases discharged from two coal-fired boilers at the West Heating Plant in Washington, D.C.

The dust collectors or "baghouses," whose malfunction engendered the subject agreement, contain honeycombs of teflon bags. The bags are mounted on wire cages and are divided among six modules in each baghouse. Flyash in the flue gases from the boilers accumulates on the outer surfaces of the bags as the gases pass through the fabric. When the "filter cake" of dust on the surface of the bags becomes excessive, impeding the flow of the gases through the fabric, a pulse of air is directed down into the bags, thereby flexing them and dislodging the ash, which falls into a hopper. This cleaning process is triggered automatically when the difference in pressure under which the gases enter and leave the baghouse (the "flange to flange pres-

sure drop") exceeds a certain level (measured in inches on a water gauge).

Section 5 of the contract's specifications set forth "Performance Guarantee Parameters," which, *inter alia,* called for each dust collector to operate under a steam output from each boiler of 220,000 pounds per hour ("pph") and a gas flow of "126,000 ACFM at 50% excess air." At the same time it was required that "[t]he flange to flange pressure drop for each unit shall not exceed 6″ W.G. ['water gauge']." Section 11 provided, *inter alia,* for certain acceptance tests to be conducted under the conditions specified by section 5, including "[i]nlet and outlet tests," *i.e.,* flange to flange. A "flange to flange" test of pressure differential would measure the pressure drop in an entire baghouse, which contained six modules. In addition, section 6 provided, *inter alia,* that "[e]ach module shall be equipped with a gage to indicate differential pressure across that module in inches of water."

Plaintiff subcontracted with Research-Cottrell, Inc. ("Research-Cottrell"), to furnish the baghouses, but remained responsible for their erection and testing. The baghouses were fabricated, furnished, and installed by Research-Cottrell and plaintiff pursuant to the specifications.

From fall 1980 to spring 1981, one baghouse was operational, but a problem with high pressure drop arose that resulted in continuous cleaning of the bags and danger of damage to them. In a letter to plaintiff dated October 30, 1980, GSA complained that, in spite of efforts to correct the problem, "[T]he pressure differential across the bags ... rapidly builds up to the range of 6.0 to 7.0 inches water gauge at 50% boiler load...." and that "the boiler may not be able to be operated at any substantial load with the 4.0 inch pressure differential across the bags predicted by Research-Cottrell."[1]

An April 8, 1981 letter from GSA to plaintiff stated:

In the wake of the March 31 and April 1 stack tests conducted by Mogul Enviroservice, it is obvious to all concerned parties that the baghouse is performing below the specified design criteria.

The March 31 test was performed with a steam output of approximately 150,000 pph, differential pressures, measured across the bags, [of] 8.5 to 9.0 inches W.G., and air volume of less than 100,000 ACFM. Those conditions are in contrast to the specified 220,000 pph steam output, flange to flange pressure drop of 6.0 inches W.G., and 126,000 ACFM air flow....

The April 1 test, performed for information only by mutual agreement with Research-Cottrell and you, was performed with approximately 170,000 pph steam output, differential pressure across the bags of 13.5 to 15.0 inches W.G., and 128,000 to 132,000 ACFM air volume.

We deduce, from the foregoing data, that the permissible airflow and output of the boiler is being limited by the pressure drop being experienced across the bags....[2]

GSA contended that the primary problem was that plaintiff failed to allow for operationally caused "shrinkage" of the bags'

1. Research-Cottrell's design calculations of the pressure drop to be anticipated as the gases passed through the baghouse assumed a 4.0-inch W.G. "pressure loss through bag & cake" and a 1.98-inch pressure drop through the entry and exit ducts and other parts of the baghouse.

2. Mogul Enviroservice was a subcontractor of plaintiff. Notes of readings from these tests are attached to the affidavit of Donald Lawrence Seckel, a construction engineer with GSA, although it is not clear who made the notes. It may be inferred, nonetheless, that plaintiff was acquainted with the test results. Readings for "PRES DIFF BAG HOUSE" appear in one column and range from 7.4 to 8.8 inches for the March 31 test at a 150,000 pph steam flow rate and reach 10.0 inches at 170,000 pph for the April 1 test. Six separate numbered columns appear under the heading "AP [*i.e.,* Delta P—for differential pressure] EACH MODULE FROM MAGNEHELIC [pressure drop gauges]." The values recorded in these columns range from 8.0 to 9.8 inches at 150,000 pph on March 31 and from 12.5 to 14.0 inches at 170,000 pph on April 1.

felted teflon cloth and that, as a result, the bags fit too tightly over their wire cages, not flexing properly or providing the specified ratio of cloth to air. Plaintiff contended that the particle size of the flyash encountered was smaller than specified, thereby resulting in clogging of the fabric.

On July 1, 1981, the parties met to discuss solutions to the problem. After negotiation it was agreed that plaintiff would install enlarged bags. Tests would then be conducted to determine the pressure drop and the size of the flyash in the flue gases. If the particle size testing reflected that the sizes were not within the range provided in the specifications, then GSA would assume that this contributed to the pressure drop problem. Depending on the results of the bag enlargement program, the cost would be borne totally by one or the other party or shared equally by both: If the pressure drop testing yielded a pressure drop of less than 6 inches, plaintiff was to bear all costs; if the pressure drop exceeded 6 but not 10 inches, the parties would share the costs equally; and if the pressure drop still exceeded 10 inches, then GSA would bear the entire cost of enlarging the bags and the project would be discontinued.

As formally proposed by plaintiff and Research-Cottrell in a letter dated July 7, 1981, under the first contingency "[t]he baghouse meets guarantee and is accepted." Under the second and third contingencies, acceptance would await further testing of "the unit" after improvement.

GSA drafted an integration of the agreement in the form of a letter to plaintiff dated July 24, 1981, which provided in part:

3. An operational test to establish that the baghouse will operate at 6″ W.G. or less, at 126,000 ACFM, must be performed. After establishment of this position, a 30 day operational period will be initiated....

4. Upon expiration of the 30 day operational period, a test will be run to determine the pressure drop across the bags at a gas flow of 126,000 ACFM.

Division of costs based on testing results was as per plaintiff's proposal. No mention was made of conditions for acceptance of the baghouse.

Plaintiff's counsel responded to this proposal in a letter dated August 27, 1981, taking exception to a section of the proposal providing that, in any event, plaintiff would bear all costs if the results of the particle size testing disfavored plaintiff. Counsel objected because even if the particle sizes were within specifications, that would not necessarily mean either that "the bag house operation problem" was caused by undersizing of the bags "or that the enlargement of those bags ... will, in fact, bring the bag house into compliance with ... the specifications." Otherwise, counsel for plaintiff was "in concurrence with the terms of the agreement set forth" and recapitulated plaintiff's understanding that if installation of enlarged bags "results in the operation of the bag house" at six inches W.G., then Grimberg would pay for the bags; "if the bag house will operate" at between 6 and 10 inches then costs will be shared; and "if the bag house is not able to be operated" at less than 10 inches, then GSA would pay. GSA rejected the proposed deletions, stating that "the Government will not accept any change to its proposed agreement of 7/24/81. Regardless of our opposing position on particle sizing, we must have your written concurrence with [counsel's] letter...."

Under protest, plaintiff proceeded with the bag enlargement program. The particle size testing reflected that the sizes were not in compliance with the specified particle sizes. The enlarged bags were then installed, the 30-day operational period followed, and after some delay the pressure drop testing began in March 1982.

A controversy arose, however, over which of two pressure differential tests was to be employed. Plaintiff argues that it was proper to use the "flange to flange" test specified in section 5 of the specifications. GSA argues that its phrase "across the bags" referred to a test within each module (the results to be averaged) and

that plaintiff knew or should have known as much. Plaintiff's affiants aver that they attached no special significance to GSA's use of the phrase "across the bags," did not interpret it as reflecting a change from the testing procedure provided for in the specifications, and were unaware that GSA intended such a change. Tests were conducted at both locations with the average pressure drop per module, measured across the module, at 6.8 inches. The flange to flange pressure drop exceeded 10 inches because of pressure loss from other parts of the baghouse. Thus, under GSA's interpretation, the costs of the enlargement program would be shared equally, whereas under plaintiff's interpretation, all costs would be borne by GSA.

## DISCUSSION

The court's first responsibility in a case such as this "is to ascertain analytically whether *vel non* an ambiguity existed," *Enrico Roman Inc. v. United States*, 2 Cl.Ct. 104, 106 (1983), regarding the type of test to be performed. Assuming *arguendo* that an ambiguity were presented by GSA's use of the phrase "across the bags" to describe the test, any ambiguity is not so glaring as to be patent and thereby put plaintiff on a duty to inquire. *See, e.g., George E. Newsom v. United States*, 230 Ct.Cl. 301, 303, 676 F.2d 647, 650 (1982). In the circumstances plaintiff was not obligated to "seek clarification of any and all ambiguities, doubts, or possible differences in interpretation." *WPC Enterprises, Inc. v. United States*, 163 Ct.Cl. 1, 6, 323 F.2d 874, 877 (1963).

The familiar rule that a non-patent ambiguity be resolved against the drafter "is subject to the condition that the alternative interpretation tendered by the other party be a reasonable one." *William F. Klingensmith, Inc. v. United States*, 205 Ct.Cl. 651, 657, 505 F.2d 1257, 1261 (1974) (per curiam); *Perry & Wallis, Inc. v. United States*, 192 Ct.Cl. 310, 316, 427 F.2d 722, 726 (1970). The issue is a question of law for the court to decide. *See, e.g., William F. Klingensmith, Inc.*, 205 Ct.Cl. at

656, 505 F.2d at 1260. The alternative interpretation need only be within the "zone of reasonableness," the Government shouldering "the major task of seeing that ... the words of the agreement communicate the proper notions...." *WPC Enterprises, Inc. v. United States*, 163 Ct.Cl. at 6, 323 F.2d at 876–77 (quoted in *Folk Construction Co. v. United States*, 2 Cl.Ct. 681, 688 (1983)). The Government "must bear the risk of an insufficient attempt, even though the plaintiff's obtuseness likewise contributed to the ... misunderstanding." 163 Ct.Cl. at 11, 323 F.2d at 879. In judging the import of the words of the contract, "the context and intention [of the contracting parties] are more meaningful than the dictionary definition," *Rice v. United States*, 192 Ct.Cl. 903, 908, 428 F.2d 1311, 1314 (1970), and the contract language "must be afforded the meaning derived from the contract by a reasonably intelligent person acquainted with the contemporary circumstances." *Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971). The court frequently must place itself in the shoes of a reasonable contractor in considering the contract language. *Id.*

Assuming *arguendo* that the words "across the bags" may support the meaning "flange to flange," plaintiff's interpretation of what the contract required was as reasonable as defendant's from the standpoint of the contract's purpose and more so when viewed in the context of the preceding negotiations. Results of both "flange to flange" and "across the bags" tests run before bag enlargement were available for comparison with post-bag enlargement tests of either type.

Defendant argues that it would be unreasonable to expect a pressure drop of less than 6 inches after bag enlargement, because "[b]oth parties knew" that a pressure drop of 4 inches was occurring in the duct work alone. Def's Br. filed Dec. 7, 1984, at 11 (citing Affidavit of Donald Lawrence Seckel ¶ 20). Given that Research-Cottrell's design calculations predicted a 4-inch pressure loss "through bag and fil-

ter cake," the GSA had given up on the entire baghouse ever meeting specifications. GSA's Mr. Seckel, however, avers only that GSA knew of the pressure loss in the ducts and that discussions with plaintiff were confined to the bag problem. Plaintiff presumably had the differing "flange to flange" and "across the bags" test results which indicated the duct problem, but it appears to have been disputed whether the problem was caused by faulty ducts or noncomplaint flue gases. *See* Plf's Ltr. dated May 5, 1982, at 6. There is no evidence, at any rate, that GSA communicated to plaintiff its despair of the baghouse's ever complying with specifications.

In contrast, plaintiff's July 7, 1981 letter indicates its understanding that, if the planned test yielded a result of 6 inches or less, the entire baghouse would be in compliance. Plaintiff plausibly argues, in favor of tying the test method to the original contract's specifications, that only if the entire baghouse tested within specifications after bag enlargement would plaintiff's sole responsibility for baghouse malfunction squarely be established. If the baghouse continued to test in excess of 6 inches flange to flange, responsibility for contract noncompliance would remain uncertain, although if performance improved (by dropping below 10 inches), plaintiff would be shown partly to blame. That the object of the exercise was to establish fault for noncompliance with the original specifications, and not merely to reward GSA if its suggestion worked and to make GSA bear the risk of failure, is apparent from the agreement that if GSA's flue gases complied with specifications, plaintiff would bear the cost of bag enlargement regardless of the results. Thus, under plaintiff's interpretation, the 6- and 10-inch cut-offs and the use of the flange to flange test have a purpose consistent with the spirit of the agreement as a whole.

GSA introduced an initial test "to establish that the baghouse will operate at 6" W.G. or less" before commencement of the 30-day operating period. In its response of August 27, plaintiff showed that it did not grasp GSA's intentions when it protested that, even if the flue gases complied with specifications, plaintiff's bags would not necessarily be at fault for the baghouse's failure to comply with specifications. Plaintiff thereby implied that, to its mind, the intent of the agreement was to saddle plaintiff with all costs only in the event bag enlargement succeeded in bringing the entire baghouse into compliance—something that could only be tested by resort to the flange to flange test. In addition, plaintiff repeatedly referred to the performance of "the baghouse" in discussing the results to be tested for and their varying consequences under the agreement, although there was no further mention of the baghouse being accepted if it tested below 6 inches.[3]

In order to determine whether the phrase itself "across the bags" is ambiguous as a matter of law, it must be shown that the parties' disagreement as to the meaning of the phrase is based on a reasonable uncertainty as to the meaning of the language used. *Perry & Wallis, Inc. v. United States*, 192 Ct.Cl. at 315, 427 F.2d at 725 (quoting *Bishop Engineering Co. v. United States*, 180 Ct.Cl. 411, 416 (1967)). The phrase is not a term of art. Defendant argues, however, that its usage was established in the course of prior dealings between the parties. *See Tibshraeny Brothers Construction, Inc. v. United States*, 6 Cl.Ct. 463, 470–71 (1984). The phrase appears in three pieces of correspondence in the record prior to formation of the agreement. The sentence in a May 11, 1981 letter from GSA, "Furthermore, the pressures across the bags at both loadings far exceeded the design parameter," does not

---

**3.** Defendant levels a charge of recent fabrication against plaintiff, arguing that plaintiff's allegations of its interpretation arose only after plaintiff had made initial tests at lower air flows and used the results to extrapolate the results under the agreed-upon air flows. The record does not reflect, however, that the question of which test to employ was broached by plaintiff first, and plaintiff's extrapolations indicated that the final results under both testing methods would favor plaintiff.

contain any internal indication of which test is producing the unsatisfactory results. Nor does the context illuminate matters.

According to Mr. Seckel, however, GSA's October 30, 1980 letter challenging the feasibility of achieving the 4-inch pressure drop across the bags predicted by Research-Cottrell "tied [GSA's] use of the term 'across the bags' to Research-Cottrell's design calculations which indicated ... 4 inches W.G. pressure loss 'through the bag and filter cake.' From this point on, a strict delineation of terminology between 'across the bags,' and 'flange to flange' ... existed." Seckel Aff. ¶ 10. *See supra* n. 1. Plaintiff also could have compared the figures given for differential pressures "across the bags" in GSA's April 8, 1981 letter with Mogul Enviroservice's test results from the individual modules and deduced the phrase's meaning from the correlation between the two.

Finally, the contrast drawn in the April 8, 1981 letter between "differential pressures, measured across the bags, [of] 8.5 to 9.0 inches W.G." and "the specified ... flange to flange pressure drop of 6.0 inches W.G." might have alerted plaintiff to GSA's usage. The point of the sentence, however, was to contrast actual results with specified results, not to draw a comparison between testing methods.

■ The court is of the view that the phrase "across the bags," as used by defendant, did not bear the requisite certainty to render it unambiguous. This leads to the crux of the matter: Even if the usage of "across the bags" was not firmly established, and even if plaintiff's understanding was consistent with the contract as a whole (defendant's not being inconsistent), was plaintiff's interpretation of the phrase reasonable? Proof of an ambiguity depends not only on an interpretation consistent with the contract as a whole, but in the first instance on the susceptibility of the disputed language to plaintiff's interpretation. *Bennett v. United States*, 178 Ct.Cl. 61, 64, 371 F.2d 859, 861 (1967).

Plaintiff argues that a reasonable contractor would construe the phrase "across the bags" to mean "across all the bags." Because the "flange to flange" test is the only one capable of furnishing a single measurement of pressure drop across all the bags, the phrase could indicate a flange to flange test. Nothing in the phrase, plaintiff argues, suggests a testing by individual modules with averaging of the results.

The court holds that plaintiff's interpretation was not reasonable. The phrase "across the bags" relates to a location, either of a test or a phenomenon (pressure drop) being tested for and to the component being tested. The phrase is not calculated to convey any information at all about the number of bags to be tested, although one can assume that the test will cover all the bags. Because gauges for measuring pressure drop through the fabric and filter cake are located in each individual module, a logical way to measure the pressure drop through the fabric and filter cake of all the bags is to take readings from the gauges on the six modules and average them. The phrase is sufficiently evocative in its own right, especially given the focus of the parties' attention on the bags themselves through the period of negotiation and the prior appearance of the phrase in contexts where its meaning could be grasped, that plaintiff was required to provide a more plausible explanation of how it construed the words "across the bags" to mean "flange to flange." Plaintiff was not permitted merely to assume that the words defendant imposed in its integration of plaintiff's proposal bore the meaning that plaintiff could attach to them.

### CONCLUSION

Based on the foregoing, defendant's cross-motion for summary judgment is granted, and plaintiff's motion is denied. The Clerk of the Court shall dismiss the complaint.

IT IS SO ORDERED.

No costs.