**PBI ELECTRIC CORP., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 385–85C.

United States Claims Court.

May 31, 1989.

James A. Pemberton, with whom was Jeffrey E. Weinstein, Washington, D.C., for plaintiff.

J. Keith Burt, with whom were Asst. Atty. Gen. John R. Bolton, David M. Cohen, and M. Susan Burnett, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

### BACKGROUND

On July 29, 1983, the Veterans Administration issued an Invitation for Bids ("IFB") to furnish all labor, material, and equipment for a building addition, telephone equipment room, and a conduit system to accommodate a new telephone system. The IFB required construction according to the specifications and drawings provided. The work was to be performed at the VA Medical Center Brecksville Unit in Brecksville, Ohio. A pre-bid site inspection was conducted on August 24, 1983. The site inspection was attended by a number of contractors including plaintiff, PBI Electric Corporation. PBI subsequently submitted a bid of $466,200.

On September 1, 1983, the VA opened the bids and determined that PBI was the low bidder. The VA issued a Notice of Award by letter dated October 13, 1983 and a Notice to Proceed dated October 27, 1983. The parties held a preconstruction meeting at the Brecksville Hospital on October 28, 1983.

In early November a dispute arose over the type of conduit appropriate for certain portions of the contract. PBI asserted it correctly based its bid on the use of electrometallic tubing ("EMT") in these areas. The VA contended that rigid galvanized conduit ("RGC") was clearly required by the specifications. After some correspondence and discussion, PBI proceeded with installation of RGC where required by the VA, however, on December 21, 1983, PBI submitted a certified claim to the VA's contracting officer ("CO") for an equitable adjustment of $75,000 and a time extension of sixty days. PBI alleged the rigid conduit requirement was a change in the contract. The CO denied the claim by letter of January 3, 1984. On January 9, 1984, PBI appealed the CO's decision to the Veterans Administration Board of Contract Appeals.

A second disagreement over the requirements of the contract arose in early February 1984.[1] The VA contended that the "solid circle[s]" on the contract drawings represented "wall outlets." PBI contended that the solid circle (also "dot symbol") was unspecific and allowed the contractor discretion to simply stub the conduit[2] or place a floor or ceiling outlet near that location. As progress on other aspects of the contract continued, the wall outlet dispute intensified. PBI asserted that installation of wall outlets was a change in the contract requiring significant additional compensation as well as additional information. After subsequent discussion and correspondence, the VA still disagreed with plaintiff and on June 26, 1984 issued a letter asking PBI to "show cause" why it should not be terminated for default for failing to perform the contract work. PBI responded on July 2, 1984 stating its desire to proceed with the contract while reiterating its position regarding the wall outlets. The CO terminated PBI for default on July 9, 1984.

On September 24, 1984, the VA awarded a reprocurement contract to Eltex Electric Company ("Eltex") in the amount of $530,-

---

1. The disagreement was apparent in PBI's daily job journal for December 27, 1983, however, the controversy was not further pursued by either party until the parties' meeting of February 3, 1984, as evidenced by the CO's report of contact of that date.

2. To stub the conduit is to terminate the conduit and place a bushing at the termination. The assumption is that a subsequent contractor would install the wires and take them from this point to an outlet.

536.[3] Work on this contract was eventually completed and accepted by the VA.

On April 17, 1985, PBI forwarded to the CO a certified claim for termination costs in the amount of $430,723.69. On June 28, 1985, PBI filed its complaint in this court claiming it had been improperly terminated for default. PBI's claim on the conduit issue, however, was still before the Board. PBI moved to have the conduit claim transferred here and this court granted its motion by its order of January 30, 1986. On March 17, 1986, the CO issued a final decision denying PBI's termination for convenience claim and assessing excess reprocurement costs of $451,830[4] against PBI. Trial was held in Cleveland, Ohio from January 9 through 13, 1989.

### DISCUSSION

### I. Termination for Default

 Much of the complaint as well as the factual and legal assertions of both parties in this case relate to the determination of whether the VA's conduit and wall outlet requirements were changes within the meaning of the "Changes" clause in the general provisions of the contract. However, where the contractor has been terminated for default and his claim is for termination for convenience damages on the basis that the default termination was wrongful, this court has held that plaintiff's claims for cost adjustments are mooted by the default and subsumed in the termination for convenience damage claim. *Ralcon, Inc. v. United States*, 13 Cl.Ct. 294, 296 (1987) (citing *Nolan Brothers, Inc. v. United States*, 186 Ct.Cl. 602, 609–10, 405 F.2d 1250, 1255 (1969)). Thus the initial issue is the propriety of the VA's July 9, 1984, termination for default of PBI's contract.

PBI's contract contained a standard termination for default clause as part of its general provisions, which reads in part as follows:

5. TERMINATION FOR DEFAULT— DAMAGES FOR DELAY—TIME EXTENSIONS

(a) If the Contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in this contract ... the Government may, by written notice to the Contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay.... Whether or not the Contractor's right to proceed with the work is terminated, he and his sureties shall be liable for any damage to the Government resulting from his refusal or failure to complete the work within the specified time.

\* \* \* \* \* \*

(d) The Contractor's right to proceed shall not be so terminated nor the Contractor charged with resulting damage if:

(1) The delay in the completion of the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor, including but not restricted to ... acts of the Government in either its sovereign or contractual capacity....

\* \* \* \* \* \*

(e) If, after notice of termination of the Contractor's right to proceed under the provisions of this clause, it is determined for any reason that the Contractor was not in default under the provisions of this clause, or that the delay was excusable under the provisions of this clause, the rights and obligations of the parties shall, if the contract contains a clause providing for termination for con-

---

**3.** The reprocurement was bid on the basis of the original contract documents as if it was being initially procured. The procedure used then required that, after award, the low-bidder would give the VA a credit in an amount equivalent to the value of work already completed and the value of materials stored on-site. In addition an amount was debited for work which was performed by PBI but was unacceptable to the VA.

Thus, while Eltex's total bid was $657,450, the actual value after the above debits and credits was $530,536.

**4.** This amount represents the value of the reprocurement contract ($530,536, *see supra* note 3), less the amount of funds which remained available under the original contract ($78,706).

venience of the Government, be the same as if the notice of termination had been issued pursuant to such clause.

PBI offers two theories by which it asserts that, according to provision (d) above, any alleged lack of progress on the project was due to acts of the Government and thus should not have caused PBI's termination for default. The first is that the VA's wall outlet requirement was not only a change in the contract but a cardinal change thus releasing PBI from any obligation to proceed.[5] Alternatively PBI asserts that the Government's failure to properly respond to their requests for additional information and clarification regarding the wall outlets prevented PBI from proceeding in a timely manner. *See, e.g., Remm Company,* ASBCA Nos. 18430, 18545, 74–2 BCA ¶ 10,876 1974 WL 1794 (1974) (holding default termination wrongful where necessary specification not provided).

### A. *Cardinal Change*

PBI contends the VA's requirement that a wall outlet be installed at all points denoted by a dot symbol on the drawings is a change beyond the scope of the contract documents. The assertion suggests a two-step analysis; first, whether the VA's directions constituted a change and, second, whether that change was redressable under the contract or was, instead, a cardinal change beyond the contract's scope.

Whether a change was ordered depends on the meaning of the contract. Not surprisingly, each party asserts initially that the contract is clear and unambiguous on its face. PBI asserts no wall outlets are required and that where a dot symbol appears a contractor is required only to stub the conduit or at most install a ceiling or floor outlet at his discretion. Defendant argues the contract clearly requires a wall outlet wherever the symbol appears. Al-

ternatively, each party argues the contract is ambiguous. PBI asserts the ambiguity is latent, compelling adoption of its reasonable interpretation. Defendant asserts the ambiguity is patent compelling adoption of its interpretation.[6]

Contract interpretation is a matter of law to be resolved by the court. *P.J. Maffei Bldg. Wrecking Corp. v. United States,* 732 F.2d 913, 916 (Fed.Cir.1984). The court must first determine whether the contract is clear or ambiguous. *John C. Grimberg Co. v. United States,* 7 Cl.Ct. 452, 456, *aff'd,* 785 F.2d 325 (Fed.Cir.1985). A contract is ambiguous if it is susceptible of two different interpretations, each of which is found to be consistent with the contract's language. *Sun Shipbuilding & Dry Dock Co. v. United States,* 183 Ct.Cl. 358, 372, 393 F.2d 807, 815–16 (1968). In this case, the primary dispute is the meaning of the dot symbol. Contract Drawing 1, titled "General Notes, List of Drawings" contains an obvious legend describing the primary symbols as follows:

LEGEND

● Telephone Device

[▣] Floor Box For Telephone Device

The court heard testimony from both parties that the dot symbol is not a standard symbol in the industry. Plaintiff's expert Mr. Eichmuller indicated repeatedly that the dot was not standard. Defendant's expert conceded this point, stating: "There are what some people might call several standards. There's no assumed-in-the business standard that one particular symbol in the electrical business would in all cases everywhere mean the same thing. There is no such national standard."

Further, the term "Telephone Device" in the legend was not sufficient, alone, to clearly explain the dot. Mr. Eichmuller

---

5. A cardinal change has been described as a "drastic modification beyond the scope of the contract," which may release the contractor from its obligation to proceed. *See Air–A–Plane Corp. v. United States,* 187 Ct.Cl. 269, 275, 408 F.2d 1030, 1033 (1969) (citations omitted).

6. Defendant further argues that even if there is a latent ambiguity PBI's interpretation may not

be adopted here. Defendant argues: PBI's interpretation is unreasonable, PBI did not rely on its asserted interpretation in compiling its bid, and VA officials clarified the bid documents by directing the use of wall outlets at the pre-bid conference. The court finds it unnecessary to address these arguments in light of its findings as discussed *infra.*

stated: "I just can't accept the word telephone device [to mean wall outlet], that is not a telephone device, to me [telephone device] would indicate a telephone instrument. . . ." On cross-examination Mr. Monaco, the Government's expert and an architect with Karl R. Rohrer Associates who designed the conduit system, was asked the question, "What telephone devices does PBI have to furnish under its contract?" He responded, "Well, the boxes, pieces of conduit. Those are devices." The court thus concludes the legend's description of the dot symbol was ambiguous, that is, the legend's use and description of the dot symbol is reasonably susceptible to more than one interpretation. *See Sun Shipbuilding & Dry Dock Co.*, 183 Ct.Cl. at 372, 393 F.2d at 815–16. The general rule in such a case is to construe the contract against the drafter, here the Government, under the doctrine of *contra proferentem.* *See Gorn Corp. v. United States*, 191 Ct.Cl. 560, 567, 424 F.2d 588, 592 (1970); *Peter Kiewit Sons' Co. v. United States*, 109 Ct.Cl. 390, 418 (1947). However, having established that an ambiguity exists, an issue arises as to whether the provision was patently ambiguous at the time of contracting. If so, then a duty arose on the nondrafting party, here PBI, to inquire as to the provision's meaning. *Fort Vancouver Plywood Co. v. United States*, 860 F.2d 409, 413–14 (Fed.Cir.1988) (citing *United States v. Turner Constr. Co.*, 819 F.2d 283 (Fed.Cir.1987)). The court must ask whether the ambiguity would have been obvious to a reasonably prudent contractor. *John C. Grimberg Co.*, 7 Cl.Ct. at 456.

Here it was apparent from the testimony that the contractor perceived some ambiguity. Paul Boros, president and chief estimator for PBI, stated that he, Paul M. Boros (his son) and another PBI employee reviewed what the estimator, Heinz Strippe, had done to make the final bid determination. Boros stated further:

They didn't tell us to come down a wall, we had assumed that's what the VA had some arrangement [sic] with the telephone company, because that was deliberately and very specifically excluded from our consideration, that they were going to do the other stuff.

The floor outlets, we were told, where we put a floor outlet, they were defined, they were described, they were detailed exactly what to do, those were in the specs just like that. *The rest of the stuff we figured, "Hey, one way or the other we've got some money in to cover this, we stub up into the ceiling, we have to put an outlet box on we are out a buck and a half a box, and that's it."*

(Emphasis added). Testimony from Heinze Strippe supported this scenario, that is, the contractor had realized an ambiguity existed, but felt it had provided in its bid for all possible interpretations.

"[I]t is not the actual knowledge of the contractor, but the obviousness of the discrepancy that imposes the duty of inquiry," *Chris Berg, Inc. v. United States*, 197 Ct.Cl. 503, 515, 455 F.2d 1037, 1045 (1972). Still, the contractor's perceptions in this case are consistent with those of the court on review of the documents. The dot symbol was undefined. As noted above, the symbol itself was not self-defining, and the description in the legend was shown to be indeterminate. There is no question that the plaintiff was not expecting to actually install "telephone devices" in the sense of a completed apparatus. The ambiguity is further highlighted by contrast with the "floor box for telephone device." The floor box was the next line in the legend and was defined by a separate detail drawing. Finally, the dot symbol, whatever it represented, was clearly a part of the project to be supplied by the contractor. The drawings are "half-tones," that is, the work to be provided by the contractor is shown much darker than other details on the drawings. Thus, it was clear the contractor would have to supply over 500 items for which there was no clear description.

█ There are strong policy considerations which underly the requirement that contractors bring major discrepancies or errors to the Government's attention. *See Beacon Constr. Co. v. United States*, 161 Ct.Cl. 1, 6–7, 314 F.2d 501, 504 (1963). Such a requirement helps avoid subsequent

litigation and promotes fairness in the bidding process by ensuring that all contractors are bidding on the same basis. *See Monarch Painting Corp. v. United States,* 16 Cl.Ct. 280, 286 (1989) (citing *Beacon Constr. Co. v. United States,* 161 Ct.Cl. at 6–7, 314 F.2d at 504). The court thus finds the provisions of the contract relating to telephone devices to be patently ambiguous. This placed PBI under an affirmative obligation to call attention to the discrepancy prior to award of the contract. Having failed in its obligation, the defect will be "taken against [the contractor] in interpreting the contract." *Beacon Constr. Co.,* 161 Ct.Cl. at 6, 314 F.2d at 504; *see Newsom v. United States,* 230 Ct.Cl. 301, 303–06, 676 F.2d 647, 649–50 (1982). Consequently, the direction by the VA to provide wall outlets can be considered neither a change nor a cardinal change.

### B. *Duty to Cooperate*

▮ Under a contract, there is an implied obligation not only to perform, but also to cooperate and not to hinder the performance of the other party. *Cedar Lumber, Inc. v. United States,* 5 Cl.Ct. 539, 549 (1984) (citing 11 Williston on Contracts §§ 1296, 1316 (W. Jaeger 3rd ed. 1968)); *L.L. Hall Construction Co. v. United States,* 177 Ct.Cl. 870, 878, 379 F.2d 559, 563 (1966); *George A. Fuller Co. v. United States,* 108 Ct.Cl. 70, 94, 69 F.Supp. 409, 411 (1947). To determine if a breach occurred it is necessary to look to the reasonableness of a party's actions in the particular context. *See Commerce International Co. v. United States,* 167 Ct.Cl. 529–35, 338 F.2d 81, 85 (1964); J. Cibinic & R. Nash, Jr., Administration of Government Contracts 214 (1985). Plaintiff argues that defendant breached its duty by failing to provide essential additional information relating to installation of the wall outlets, namely, a wall outlet detail similar to that given for the floor outlet and details of wall interiors at the medical center. However, the court finds merit in defendant's argument that the Government acted reasonably and provided the contractor with adequate information and direction to perform the work related to wall outlets.

In essence the parties reached a standoff with regard to additional information. PBI's initial request for clarification regarding whether the dot symbol represented wall or floor outlets was resolved by the CO's letter of April 4, 1984, stating the VA's interpretation of the contract was that wall outlets were required. A subsequent request for a change order by PBI dated April 18, 1984, was clearly rejected by the CO's decision of May 3, 1984. While the issue of inadequate information was raised in PBI's letter of May 4, 1984, PBI simply made the general statement that the specifications and drawings are "inadequate" to provide wall outlets. PBI did not specify what additional information was needed.[7] The VA promptly responded that

7. This letter along with PBI's letters of May 25 and June 11 state PBI "will not do [the wall outlet work] without an appropriate contract modification." Defendant argues that these statements were anticipatory repudiations of the contract, allowing the contractor to be terminated for default regardless of whether installation of wall outlets was a change. Anticipatory repudiation of a contract requires a "definite and unequivocal manifestation of intention on the part of the repudiator that he will not render the promised performance when the time fixed for it in the contract arrives." Corbin on Contracts, § 973 (1951). It was clear as of April 4, 1984 that the VA interpreted the dot symbols as wall outlets and did not intend to provide a contract modification as to this item. Yet PBI asserted repeatedly in subsequent correspondence that it considered the work a "cardinal" change in the contract and that it would not do the work without a prior modification which included additional compensation. PBI's letter of May 4 stated: "In any case, we do not recognize, nor claim nor agree, under any circumstances, except a negotiated contract modification, that this is our work." Similarly its letter of May 25 stated: "we cannot begin to do this work for lack of information alone, and will not do this work without a prior appropriate contract modification that includes design and additional compensation for this new scope of work." PBI made similar statements in letters of June 11 and June 19. PBI never altered its position. Even its response to the show cause letter is consistent with its position that it would not do the work without additional payments being authorized. In sum, PBI clearly and without equivocation, stated to the VA that it would not complete the wall outlet work without a modification providing additional compensation even after the CO indicated there would be no such modification. Thus, PBI anticipatorily re-

the "[d]rawings and specifications [were] not inadequate," in its letter of May 21. PBI iterated by its letter of May 25 that it could not proceed "for lack of information alone." Again PBI did not specify the nature of the information required.

PBI's letters of June 4 and June 11, 1984 assert that PBI was "holding" for information that Ms. Zarzour agreed to provide. The nature of the information requested is unclear, however, the letter to PBI from Ms. Zarzour dated June 28 states that PBI was not instructed to "hold" for information, but rather was directed to proceed. The June 28 letter is consistent with PBI's earlier letter of June 19 which in contrast to the June 4 and June 11 letters suggests PBI was instructed to proceed. Regarding wall outlets the June 19 letter states: "This problem will not go away by insisting that we have to do this work 'as shown on the drawings' or as 'per industry standards.'" The court, regarding this exchange, concludes that plaintiff was not told to "hold" all progress pending the provision of information, but rather was told by Ms. Zarzour to proceed pursuant to the drawings and industry standards. This is consistent with the VA's letters of June 28 and July 3. The only information subsequently provided plaintiff was a simple sketch giving a range of mounting heights for wall outlets.

In the meantime, on June 26, 1984, the VA had issued a show cause letter giving PBI ten days to explain why it should not be terminated for default. As is apparent from the above correspondence and PBI's response, dated July 2, to the show cause letter, PBI maintained its position that additional information was required. The July 2 letter also requested "details, drawings and specifications on wall outlets."

The factual issue before the court then is whether, as plaintiff has asserted, additional information was necessary to continue performance. While PBI offered some evidence that they could not proceed without additional information, much of PBI's own

testimony and that of the Government call for a finding that PBI could have proceeded without additional information, but that to do so would have been somewhat more difficult or costly than if additional information had been provided. Plaintiff's estimator, Mr. Strippe testified as follows:

> Q: How many wall telephone outlets did you believe that PBI would be required to construct?
>
> A: Six at the most.
>
> Q: I think it is fair to say that you testified that the drawings show no detail for a wall telephone outlet?
>
> A: That's correct.
>
> Q: How, then, did you plan to construct or install these six wall telephone outlets?
>
> A: I don't know. I have to go and see the walls and check them out, and see what it takes to do it. But, the six I don't mind. Six out of how many there are, that's no problem. Just put money in for it. You put in a $150.00, $200.00 for each wall.

This testimony is consistent with PBI's April 18, 1984 letter requesting a change order for the wall outlet work, which stated:

> Will you please consider the above quotations, A and B [for the wall outlet work], as estimates based on assumed conditions which, to be verified, will have to be reconfirmed by a point-by-point evaluation of each single outlet of 548 to establish actual value of work added.

Mr. Eichmuller, plaintiff's expert, testified that "different types of wall construction should have been defined, and instructions should have been given as to how [to] cut and repair different types of wall construction." He also testified that the National Electric Code cited by defendant did not provide sufficient information to install wall outlets. However, he did not state that additional information was essential for installation of the outlets or that the contractor could not develop the information through point-by-point analysis. Fur-

---

pudiated the contract as to work related to the wall outlet requirement. The court notes, however, that a finding of anticipatory repudiation

is not necessary to a determination that the default was proper.

ther, he testified the National Electric Code did provide information regarding conduit installation. For the government, Mr. Monaco testified that in his opinion no further information was needed by the contractor to allow it to install wall outlets.[8] The court also notes that no wall or wall outlet details were furnished in the reprocurement package and no showing was made that Eltex, the subsequent contractor, was provided any such information.

▆ The court thus finds that based upon the documentary and testimonial evidence, the additional information requested by plaintiff might have made wall outlet installation easier but was not essential to allow the contractor to complete the project. The court is constrained by this finding to reject the factual premise behind plaintiff's argument that the Government breached its duty of cooperation by failing to provide plaintiff with necessary or essential information.

As noted above the gravamen of the court's inquiry in cases involving a breach of the duty of cooperation is the reasonableness of the Government's action considering all the circumstances. See, for example, the cases cited by plaintiff in its pre-trial brief, *Ascani Construction & Realty Co.*, VABCA 1572, 1584, 83–2 BCA ¶ 16,635 at 82,721 (1983) (finding the lack of progress in the contract was due to "inordinate, unreasonable Government delay"); *Seven Sciences, Inc.*, ASBCA 21079, 77–2 BCA ¶ 12,730 at 61,877 (1977) (finding the Government breached its implied warranty of adequacy with respect to design specifications, failed to respond to numerous requests for necessary information, and failed to consider a redesign proposal where the original design was shown to be defective); *G.W. Galloway Co.*, ASBCA 17436, 17723, 17836, 17911, 18324, 77–2 BCA ¶ 12,640 at 61,298 (1977) (finding "[p]rogress payments had been stopped, appellant's valid claims and legitimate complaints had received little, if any, recognition, and its attempts to definitize bonding

and inspection criteria once and for all were met with intransigence"); *Remm Co.*, ASBCA 18430, 18545, 74–2 BCA ¶ 10,876 at 51,767 (concluding that "Remm could not reasonably be expected to proceed with the rework ... [t]he Army's response that the problem was Remm's was not reasonable"); *see also* J. Cibinic & R. Nash, Jr., Administration of Government Contracts 214 (1985). In response to plaintiff's assertions that additional information was required, the Government made clear in a timely fashion that it did not consider additional information necessary for plaintiff's performance and directed the contractor to perform. We cannot find this to be an unreasonable action.

Finally, even assuming the information requested by plaintiff was necessary to performance, plaintiff's argument would fail. Plaintiff's need for the wall information was inextricably linked to its failure to inquire as to the meaning of the dot symbol. If the wall information was as essential to performance as plaintiff argues then it would be the type of information which would be obviously lacking had plaintiff discovered through a prebid inquiry that wall outlets were required by the contract. In other words, where the court has construed the contract to require wall outlets, a subsequent finding that in order to perform the contractor would require a detail of wall construction at over 500 locations and a wall outlet installation detail would suggest strongly that the lack of such information was a glaring defect obligating the contractor to inquire. *See Beacon Constr. Co.*, 161 Ct.Cl. at 6–7, 314 F.2d at 504. In contrast, both *Remm* and *Seven Sciences*, cited by plaintiff, specifically found that the information or clarifications requested by the contractors were not of the type which should have been addressed prior to award. *Seven Sciences, Inc.*, 77–2 BCA ¶ 12,730 at 61,877–78 ("It follows from the Government's warranty of the adequacy of its design that appellant was

---

8. Rohrer Associates, Monaco's firm, in fact, produced the drawings. Further, plaintiff showed Mr. Monaco had a significant ownership interest in the company and had considered the

possibility of a suit against Rohrer by the Government if the contract documents were found to be defective. The court has considered these facts in assessing his testimony.

not obliged to undertake time consuming and expensive checking of the Government's drawings prior to bidding.... We are unable to conclude that the design deficiencies and insufficient parts descriptions which appellant reported after award were so patent or glaring that appellant reasonably should have been prompted to inquire concerning them prior to award."); *Remm Co.*, 74–2 BCA ¶ 10,876 at 51,767 ("the circumstances were not of the type which would require clarification preceding award of the contract"). The court concludes that the failure of the contractor to proceed with the wall outlet work was not due to lack of cooperation on the part of the Government and that termination for default was therefore appropriate.

## II. RGC Versus EMT

█ Early in the contract another dispute arose as to the type of conduit to be used in certain portions of the contract. As noted, any claim for equitable adjustment is subsumed in plaintiff's termination for convenience claim. In the event plaintiff may have been forced, based on its own unreasonable interpretation of the contract, to incur unanticipated costs, this may have resulted in a loss adjustment to any subsequent termination for convenience settlement. Since the court has held the termination for default to be proper, however, the issue could relate only to the proper value of work performed. In any event, the court finds plaintiff's argument to be without merit. The issue is one of contract interpretation. Specifically plaintiff alleges the contract allowed it to use electrometallic tubing ("EMT"), a lighter conduit, throughout the project, rather than rigid galvanized conduit ("RGC"), a heavier more expensive conduit. The Government responds that the contract provisions specifically limited the maximum size of EMT to two inches, thus precluding its use in areas where a larger size conduit was specified.

Each specification section in the contract contains three parts. Part one is titled "General," part two is "Products," and part three is "Execution." Some examples of section titles are Carpentry and Mill-

work, Flexible Sheet Roofing System, Gypsum Wallboard Systems, Insulation, Plumbing Systems, Motors, etc. Specification section 16111 is titled Conduit Systems. Part one, the "general" part contains the following provision:

1.1 Description:

. . . . .

B. Definitions: The term conduit as used in this specification, shall mean any or all of the raceway types specified.

Part two of section 1611, "products," states:

2.1 Material:

A. All conduit and fittings shall be UL listed, in accordance with the NEC, and as hereinafter specified.

....

C. Conduit:

....

4. Electrical metallic tubing (EMT): Fed.Spec. WW–C–563 shall apply. *Maximum size permitted shall be 2–inch.* It shall not be used with cable rated above 600 volts.

....

9. *Rigid steel conduit shall be used in pipe utility basements and main runs between buildings.*

(Emphasis added.) The remainder of the products section provides detailed descriptions of Conduit Fittings, Conduit Supports, Outlet Junction and Pullboxes, etc., providing directions to the contractor and noting the applicable federal specifications.

Part three, the execution part of section 16111 contains the following subsection which reads, in total, as follows:

3.12 Telephone Conduit:

A. Install a complete empty conduit system for telephone service. Raceway system will be as shown on the drawings, and as required by the local telephone company.

B. Minimum size conduit shall be ¾-inch, but not less than shown on the drawings.

C. Conduit bends and elbows shall be long radius.

D. Furnish and install ¾-inch "fire retardant" plywood on the back wall of all telephone closets and on other walls as shown on drawings. Plywood is to be eight feet high with the bottom one foot above the finished floor.

E. Floor boxes shall be aluminum or Type 302 stainless steel with coverplate and grommeted opening for telephone service.

Plaintiff claims that this subsection was the only requirement in the specifications applicable to telephone conduit. The court holds this to be an unreasonable interpretation of the specifications and further concludes that the only reasonable interpretation of the specifications, as structured, is that the "general" and "product" parts of the "conduit" section applied to telephone conduit as well as to other conduit.

The organization of the specifications, maintained throughout, makes clear that for any given section all parts must be considered to properly provide or install that section's system. The "general" section will provide general information applicable to the section's system or item, the "product" section provides specific information about the products to be used, and the "execution" section offers additional information necessary for proper installation of the system.

It is unreasonable to assume that the detailed descriptions in the "product" section are rendered inapplicable to telephone conduit by the brief general language of the telephone conduit subpart. *See Dravo Corp. v. United States*, 202 Ct.Cl. 500, 504, 480 F.2d 1331, 1333 (1973); *Kenneth Reed Constr. Corp. v. United States*, 201 Ct.Cl. 282, 290, 475 F.2d 583, 587 (1973). Particularly is this so in light of the general definition of conduit as "any or all of the raceway types specified." The only reasonable interpretation of the contract is that the product notes limiting EMT to a maximum size of two inches and requiring the use of RGC in main runs are applicable to telephone conduit.

III. Damages

The Federal Procurement Regulations, which are incorporated in government contracts, *see Related Industries v. United States*, 2 Cl.Ct. 517, 527 (1983), describe the effect of termination for default in part as follows:

> If a contractor's right to proceed is terminated for default, the Government may take over and complete the work or cause it to be completed, and the contractor ... shall be liable to the Government for any increased costs caused thereby.

41 C.F.R. § 1–18.803–3 (1983). Here plaintiff contends that the Government failed to accurately assess the value of completed work and that the Government failed to carry its burden of proof regarding its excess reprocurement costs.

A. *Work Performed Prior to Termination*

The payment provisions in this fixed price contract provided for monthly or more frequent payments to the contractor based on estimates of the percentage of work completed. While the default termination clause allows the Government to use unpaid progress payments or retainage to offset excess reprocurement costs, it does not release the Government generally from its obligation to the contractor for the contract value of work completed to the date of termination. *See* 41 C.F.R. § 1–18.803 (1983).[9]

---

9. 41 C.F.R. § 1–18.803–9 states in part:

[A]ny progress payments due for work completed prior to termination of the right to proceed shall be used for the purpose of liquidating the liability of the contractor and his surety to the Government.... Where the retained and unpaid amounts are insufficient to liquidate such liability, steps shall be taken to recover the additional sum from the contractor and his surety.

The corollary to the above is that if no damages resulting from the default are proven, any unpaid progress payments due on work performed prior to termination must go to the contractor. Otherwise, the Government would receive a windfall. *See Michigan Bldg. Maintenance, Inc.*, IBCA 1945, 87–1 BCA ¶ 19,461 (1986); *Carpet Cleaners, Inc.*, VABCA 1965, 1984, 84–3 BCA ¶ 17,585 (1984); *Ventilation Cleaning Eng'rs, Inc.*, ASBCA 16678, 16774, 72–2 BCA ¶ 9537 at 44,430 (1972); *cf. Davidson Enterprises, IBCA*

Here there is no dispute that $166,153.68 in progress payments were properly made to PBI by the CO. However, there is a dispute as to a payment of $225,000 made by the CO after termination of the contract and after PBI's action in this court had been filed. Defendant has asserted a counterclaim for the $225,000, asserting that the payment was an unauthorized settlement.

Defendant's argument is made pursuant to 28 U.S.C. § 516, which reserves supervision over conduct of litigation to the Department of Justice. *See United States v. Newport News Shipbuilding & Dry Dock Co.,* 571 F.2d 1283, 1287 (4th Cir.), *cert. denied,* 439 U.S. 875, 99 S.Ct. 212, 58 L.Ed.2d 189 (1978). Defendant established that the payment was made by VA officials subsequent to the filing by PBI of its claim in this court. Thus, defendant argues, the VA was not authorized to make the payment. Plaintiff argues however that the payment was a progress payment unrelated to the claims litigated and thus not subject to the limitation. *See Hughes Aircraft Co. v. United States,* 209 Ct.Cl. 446, 465–66, 534 F.2d 889, 901–02 (1976). The court recognizes the distinction drawn by *Hughes,* but finds defendant's argument has merit. Here, PBI's claim sought to convert a termination for default into one for convenience. Particularly in light of our discussion of 41 C.F.R. § 1–18.803–7, any amount due for work completed prior to the date of the claim clearly became part of such a claim on its filing. Thus, any payment on the work performed should have been authorized by the Attorney General. The payment was therefore unauthorized when made. The issue remains whether plaintiff is nonetheless entitled to this amount as payment for work done prior to termination. The court finds that it is.

Plaintiff offered testimony that the payment was a progress payment made in an amount consistent with the work in place. The documents support the plaintiff's view. The payment was made based on an invoice supplied by PBI which stated:

*For work performed* under Contract No. V541C–356 dated 10/13/83 for PBX & Conduit System for Telephone System at the VA Medical Center, Brecksville Unit.

### SIXTH PROGRESS REPORT—FINAL PAYMENT

| FOR PERIOD ENDING 8/19/85 | | |
|---|---|---|
| | Amount of Contract | $466,000.00 |
| | Change Orders Issued | $ 3,759.80 |
| | Current Contract Amount | $469,959.80 |
| | Less Value of Incomplete Work | $ 0.00 |
| | Value of Work in Place to Date | $371,697.68 |
| | Value of Unused Material Previously Paid For | $ 19,456.00 |
| | Earned to Date | $391,153.68 |
| | Total Previous Payments | $166,153.68 |
| | Payment This Period | $225,000.00 |

(Emphasis added.) The invoice clearly requests payment for work in place. That the Government viewed it the same way is supported by the following stamp—below which the contracting officer signed and dated the invoice:

I approve the payment of this estimate in the amount of $225,000.00 and I certify that the articles and/or services have been received and/or rendered in accordance with the terms of the contract.

Defendant argued that a government sheet attached to the invoice in defendant's exhibit 81 demonstrated that the payment was a settlement. The document stated: "Lines 55 thru 63 are adjusted to reflect

1853, 2049, 2167, 88–1 BCA ¶ 20,267 at 102,586–87 (1988) (supporting the proposition but finding work in place was defective and thus of minimal or no value to the Government).

previous payments and this final settlement per defaulted contract." While this language and the roundness of the figure itself might suggest some element of the payment was settlement value, the government document rebuts itself. On the next page the document breaks the payment down into particular values for different items of work, e.g., Bldg. 1 & PUC To 52—$31,236.00; Add. Equipment Room—$42,424.20; etc. The dollar values for the items of work are identical to those provided by Mr. Boros in an earlier version of the invoice which also gave percentage completion figures for the various work items. The government chart thus strongly supports the view that the payment reflected the actual contract value of work rendered to the date of termination.

The documentary evidence is consistent with the testimony at trial. Paul M. Boros testified for plaintiff that the $225,000 additional payment was the resolution of the parties' disagreement over the value of work completed. Mr. Boros indicated he then allocated the dollar value to particular work areas. Mr. Harrison, Assistant Chief of Supply for Brecksville, participated in the discussions for the Government. His testimony was in part as follows:

Q: Okay. Now, let me ask you—I believe you stated that you reached agreement on a figure of $225,000. Can you tell us a little bit what the basis of your coming up with that number was?

A: There was a complete review which involved many parties and the VA engineering people, supply people reviewing *the costs data submitted by the contractor over the length of the contract as well as his claim data, which is basically the same thing.*

(Emphasis added.) Mr. Lukans, Chief of the Product Construction Section at the Cleveland VA Medical Center, testified that he acted as a technical advisor to Mr. Harrison in the discussions. He stated his understanding of the payment was that it "would be a final payment which would clear the books on the contract." The court finds the Government testimony consistent with the notion that the primary inquiry in the discussions was the value of work completed. The $225,000 was the figure both parties could agree on as the remaining obligation of the Government on work performed and no identifiable amount was shown to be attributable to the settlement value of any of plaintiff's claims. That it was a negotiated figure does not alter the fact that it represents the parties' agreement as to the value of work completed. All progress estimates submitted by the contractor are subject to the contracting officer's approval. Thus the court finds that the contractor is entitled to keep the $225,000 to compensate for undervalued progress payments to the date of termination.

### B. *Reprocurement Costs*

Defendant seeks $451,830 [10] in excess reprocurement costs. Where a contractor is properly terminated for default, the Government is entitled to recover the excess cost of reprocuring the uncompleted work where it demonstrates those costs were reasonably incurred. *See Cascade v. United States,* 773 F.2d 287, 293 (Fed.Cir. 1985). The determination of reasonability is a question of fact. *Chemithon Corp. v. United States,* 1 Cl.Ct. 747, 751–52 (1983).

■ The reprocurement was bid based on the original procurement documents. Contractors were to bid as if bidding on the original contract with the understanding a credit would subsequently be given to the VA for work completed by PBI. The court finds this method of reprocurement highly suspect. The reprocurement was competitive, in that new bids on the original contract documents were solicited and the low bidder was chosen. However, this appearance of competitiveness is illusory where the value of work in place was not established until after the contract was awarded.

---

10. The court notes a relationship between this value and the $225,000 that is the subject of a Government counterclaim. The $451,830 represents the reprocurement contract value of $530,536 less the $78,706 in funds remaining from the original contract after all payments to PBI, including the $225,000. If the $225,000 had been returned to the Government, the $451,830 figure would have been reduced to $226,830.

The credit was established by the new contractor subject to approval by the VA after award. In sum then the actual value of the contractor's bid was not determined until after award and was fixed by the successful bidder. The court finds such a method is not entitled to a presumption of regularity.

Nor does the record regarding how the value of work in place was determined help support the process. Eltex, which was awarded the subsequent contract, gave the VA a credit of $126,914, representing the value of work in place and stored materials left by PBI. However, testimony of Mr. McBride, Chief of Engineering Service at Brecksville, and Mr. Herrit, the contracting officer's technical representative at Brecksville, made clear that the estimate was made by Eltex without VA supervision. Mr. Herrit who reviewed the credit estimate for the VA limited his review to determining whether the values given were "reasonable." Herrit stated: "All we [Herrit along with Dennis Grella and another VA employee] did was make our recommendation that these were fair prices" to McBride. McBride relied on this evaluation at the time. There was no independent survey by the VA of work in place at the time Eltex's credit was accepted. Further, the person who principally reviewed the estimate, Mr. Herrit, was not shown to have any experience in estimating or bidding contracts. And Eltex, which actually made the estimate, had a strong incentive to minimize the credit where any reductions in the credit were translated dollar-for-dollar into an increase in the value of their contract.

The court finds the Government failed to carry its burden to show that its reprocurement costs were reasonably incurred. Calculation of the cost of the reprocurement was not genuinely competitive. Further, while Mr. Herrit testified he thought the values presented by Eltex were reasonable, he had no experience in making such determinations and he made no independent assessment of the work in place. The value of the credit also contrasts sharply with the value of work done as established by the sixth progress payment, suggesting the re-

procurement contract was significantly overvalued with respect to the work which remained. Any attempt by the court to determine the actual value of the reprocured work on the basis of the evidence before it would be pure speculation. Accordingly defendant is not entitled to the $451,830 claimed as excess reprocurement costs. *See Willems Industries, Inc. v. United States*, 155 Ct.Cl. 360, 376, 295 F.2d 822, 831 (1961), *cert. denied*, 370 U.S. 903, 82 S.Ct. 1249, 8 L.Ed.2d 400; *G.M. Shupe, Inc. v. United States*, 5 Cl.Ct. 662, 719–20 (1984).

### CONCLUSION

The court finds defendant's termination of plaintiff's contract for default was proper and thus rejects plaintiff's claims. The court also finds that the total amount paid to PBI, including the sixth progress payment of $225,000, properly represented the value of work done to the point of plaintiff's termination and that defendant has failed to carry its burden with respect to proving damages resulting from the default. Both parties' claims are thus denied. The clerk is directed to dismiss the complaint and counterclaim. No costs.